# IN THE COURT OF APPEALS OF IOWA

No. 15-0386
Filed February 10, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JAMIE DEAN TRICKEL,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Scott County, Paul L. Macek, Judge.

The defendant appeals from the judgment and sentence for convictions of burglary in the first degree and sexual abuse in the second degree. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Joseph A. Fraioli (until withdrawal) and Vidhya K. Reddy, Assistant Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall and Kevin Cmelik, Assistant Attorneys General, for appellee.

Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**DANILSON, Chief Judge.**

Jamie Trickel appeals from the judgment and sentence for his convictions of burglary in the first degree and sexual abuse in the second degree. He maintains the district court abused its discretion by admitting into evidence over his objection three photographs recovered from his phone as well as testimony that there were 1100 photographs of a similar nature recovered. He maintains the evidence was irrelevant and unduly prejudicial.

Because the images recovered from Trickel's phone and the testimony of the forensic examiner were relevant, and the probative value of the evidence substantially outweighed the danger of prejudice, the district court did not abuse its discretion in admitting the evidence. We affirm.

**I. Background Facts and Proceedings.**

On May 2, 2014, Trickel was charged by trial information with burglary in the first degree, in violation of Iowa Code sections 713.1 and 713.3 (2013), and sexual abuse in the second degree, in violation of sections 709.1 and 709.3.

The matter proceeded to trial on December 15, 2014.

At trial, V.D. testified that she was living in Davenport with her daughter on March 27, 2014. That night, V.D. and her daughter were at home when her brother, Todd, stopped by at approximately 9 p.m. in order to say goodbye before he left for military training.

After leaving V.D.'s home, Todd went to say goodbye to their brother, Tyson. At 9:16 p.m., while he was with Tyson, Todd received a phone call from Trickel. Todd testified that it was odd to receive a phone call from Trickel because they usually did not contact each other. During the seven-minute call,

Trickel asked Todd if he was at V.D.'s home. Todd told him he was with Tyson at Tyson's place of employment. Trickel—who lived approximately one block from V.D.—indicated that he had seen Todd at V.D.'s earlier and asked what he planned to do for rest of the night. Todd stated that he had to pack before leaving for training, and the phone call ended.

At approximately 9:40 p.m., V.D.'s dog began growling and scratching at the back door. When V.D. opened the door to let the dog outside, she was met by a man pointing a gun at her. V.D. testified the intruder was wearing a knit ski mask, a dark hooded sweatshirt, dark-colored Dickie's or work pants, black tennis shoes, and light blue rubber gloves.

Motioning with the gun, the intruder walked V.D. back into her home and accused her of owing Rico lots of money. After V.D. denied knowing anyone named Rico, the intruder told V.D. that her "baby daddy" Chris owed Rico a lot of money and asked where Chris lived. The intruder threatened to come back to V.D.'s home again and stated he knew where her mother and brothers lived. V.D. told the intruder where Chris lived. Instead of leaving, the intruder asked V.D. if she had any shoes. She showed him her shoe rack, and the intruder asked V.D. to put on a pair of gray high-heeled shoes. After she put them on, the intruder pulled out a dark blue Samsung phone, put the phone over her feet, and stated, "My boss has a fetish." V.D. believed he was taking pictures although she did not see a camera flash.

The intruder then told V.D. to face the door behind her. When she turned around, she felt a shock on her right side that made her fall to the floor. Once she was on the ground, the intruder climbed on top of her and kissed her. He

slapped her, and when she twitched, she was shocked again—this time on the left side. The intruder removed her pants and underwear and touched her vagina with his gloved finger. He also rubbed her vagina with his penis. After that, the intruder redressed V.D. and left.

V.D. then called her friend, Donna. Donna and her husband picked up V.D. and her daughter to stay at their house for the night. V.D. recounted the incident to Donna.

When V.D. returned home the next day, March 28, she observed that her back porch light had been unscrewed and the back door was damaged.

Tyson also testified at trial. He testified that Trickel called him on the afternoon of March 28. Trickel told him he saw a man at Wal-Mart who indicated that V.D.'s ex-boyfriend, Chris, "owes a lot of people money, and they were going to send a message." Shortly thereafter, Trickel picked Tyson up from his apartment and they went to V.D.'s home. When they arrived, V.D. came outside to talk to them. V.D. and Tyson testified that Trickel asked V.D. if she knew anyone named Rico and if she knew that Chris owed Rico money.

Trickel testified at trial as well. His testimony differed in that he stated he called Tyson on March 28 to ask if he wanted to "hang out for a little bit." Trickel testified that it was Tyson's idea to go see V.D. at her home that afternoon. He testified that Tyson and V.D. talked at V.D.'s house, but he was not part of the conversation and did not know what they discussed.

All three testified that at some point during the conversation on the afternoon of March 28, V.D. and Tyson left Trickel outside while they went inside the house to talk. While inside, V.D. told Tyson about the incident the night

before and that she believed Trickel was the intruder. She testified that she recognized his voice and his eyes from the previous night.

Shortly thereafter, Tyson and Trickel left. Tyson told Trickel about V.D.'s accusations, and Tyson testified Trickel told him that he and his wife were at Wal-Mart the night before from 8:15 to 10 p.m.

On March 29, V.D. reported the incident to the local police. She reported that she believed Trickel was the perpetrator.

The police executed a search warrant of Trickel's residence on April 21, 2014. During the search, the police recovered a blue Galaxy Samsung cellular telephone, a semi-automatic Glock handgun, two different types of stun guns, a black ski mask, a black hooded sweatshirt, a dark blue hooded sweatshirt with a decal, black tennis shoes, and a box of light blue latex gloves. Forensic examination of the cellular telephone did not recover any photographs of V.D. wearing the gray high-heeled shoes. The examiner did recover "over 1100" photographs with "the common feature [of] the presence of high heeled shoes." Trickel objected to the examiner's testimony regarding the number of images as well as the three images that were admitted as exhibits.

Both Trickel and his wife testified that Trickel was home the entire night of March 27, 2014. They testified they spent time together earlier in the day, searching for a job for Trickel until approximately 5:30 p.m. Upon their return home, Trickel watched television in the couple's bedroom, while his wife went to the grocery store and then made the family dinner. They ate at approximately 7 or 7:30 p.m. Afterward, their two children played video games in their room while

Trickel watched television in the couple's bedroom until his wife joined him for bed at approximately 9:45 p.m.

On December 19, 2014, the jury returned a verdict finding Trickel guilty of both counts. He was sentenced to two concurrent terms of incarceration not to exceed twenty-five years.

Trickel appeals.

**II. Standard of Review.**

We generally review evidentiary rulings for an abuse of discretion. *State v. Helmers*, 753 N.W.2d 565, 567 (Iowa 2008). The district court has abused its discretion when it exercises it "on ground or for reasons clearly untenable or to an extent clearly unreasonable." *Id.*

**III. Discussion.**

Over Trickel's objections, the State sought to admit three exhibits of photographs recovered from Trickel's phone. The images are of women wearing dresses and high-heeled shoes. In two of the images, a woman is sitting on a couch indoors. In the third, a woman is crouching outside on a path. Additionally, after having the photos admitted, the prosecuting attorney asked the forensic examiner if they were "exemplary of any other screen shots or any other files" found on the device. The prosecuting attorney then specified, "And what is—is the exemplary feature that is the common feature the presence of high heeled shoes?" The forensic examiner agreed and stated over 1100 such images were recovered. Trickel maintains this was an abuse of the court's discretion because the evidence is irrelevant and unduly prejudicial.

Irrelevant evidence is not admissible. Iowa R. Evid. 5.402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401.

Even relevant evidence should not be admitted when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Iowa R. Evid. 5.403. "We employ a two-part test to decide whether evidence should be excluded under the rule." *State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013). "First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact." *Id.* (citation and internal quotation marks omitted). "A determination of the probative value of relevant evidence focuses on the strength and force of the tendency of the evidence to make a consequential fact more or less probable." *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000) (citation and internal quotation marks omitted). "Unfair prejudice arises when the evidence prompts the jury to make a decision on an improper basis." *Id.*

Even if irrelevant evidence is admitted, reversal is only required when a "substantial right of the party is affected." *Id.*; *see also* Iowa R. Evid. 5.103(1). However, we presume prejudice from the admission of irrelevant evidence. *Graber*, 616 N.W.2d at 638. Accordingly, we reverse unless the record shows a lack of prejudice. *Id.*

Here, we cannot say the district court abused its discretion by admitting the photos and the forensic examiner's testimony about the number of similar

photos found on Trickel's cellular telephone. Identity and motive were both issues at trial. V.D. testified that the masked intruder asked her to put on high-heeled shoes before he sexually assaulted her. The fact that Trickel had 1100 images of women wearing high heels on his phone was a relevant fact for the jury to consider when deciding the identity of the masked intruder.

Next, we must decide whether the probative value of the evidence substantially outweighed the danger of unfair prejudice or confusion. *See id.* Here, the chance that the jury would use the images for an improper purpose is low. The images were not the sort to arouse strong emotions. *See State v. Putman*, 848 N.W.2d 1, 14 (Iowa 2014) ("Evidence is unfairly prejudicial if it has an undue tendency to suggest decisions on an improper basis commonly, though not necessarily, an emotion one." (citation and internal quotation marks omitted)). Trickel maintains the State mischaracterized the images by stating, "[T]he import of these pictures lies on each of the women's feet." Trickel maintains such a statement was prejudicial because "the shoes are hardly the focal point of the images." The jury was instructed that "[s]tatements, arguments, questions and comments by the lawyers" are not evidence. Additionally, the jury was given a limiting instruction, stating, "You have heard evidence that the defendant had a number of images in his phone. Possessing such images is not a crime. This evidence can only be used to show motive, intent, or the identity of the person charged." "[I]n most cases a limiting instruction such as this is an antidote for the danger of unfair prejudice." *Id.* at 15. Additionally, "juries are presumed to follow the court's instruction." *State v. Becker*, 818 N.W.2d 135, 162 (Iowa 2012).

Because the images recovered from Trickel's phone and the testimony of the forensic examiner were relevant, and the probative value of the evidence substantially outweighed the danger of prejudice, the district court did not abuse its discretion in admitting the evidence.  We affirm.

**AFFIRMED.**