**IN THE COURT OF APPEALS OF IOWA**

No. 21-1535
Filed February 8, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**WOUR NATHANIAL MAGANG,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Polk County, David M. Porter, Judge.


    A defendant appeals his convictions and sentences. **AFFIRMED.**


    Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

    Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee.


    Considered by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**SCHUMACHER, Judge.**

Wour Magang appeals his convictions and sentences for second-degree robbery and first-degree burglary. Magang contends the court wrongly admitted footage from a police officer's body camera. He claims his convictions are not supported by sufficient evidence and claims the district court utilized the wrong standard when considering his motion for a new trial. He also claims the court abused its discretion during sentencing. We find the court properly admitted the officer's body camera footage. Sufficient evidence supports Magang's convictions. The district court did not use the wrong standard when deciding Magang's motion for a new trial. And the court did not abuse its discretion in sentencing. Accordingly, we affirm.

I.      **Background Facts & Proceedings**

The events underpinning Magang's convictions occurred in the early morning hours of August 25, 2019. Around 2:55 a.m., Janet Leon called 911 to report a burglary. She reported that as she opened the door to let her friend leave, two men entered her home with guns. They stole her safe, which contained money and credit cards, then ran away through the parking lot. She reported that she was "bleeding like crazy" because her "head's fucking gashed in."

Police responded to the scene about six minutes after Leon called 911. Upon arriving, Officer Jordan Ulin found Leon bloodied and wandering around outside her apartment. Ulin's body camera showed Leon mumbling and calling for her cat, which escaped during the burglary. Without prompting, Leon showed the officer where the safe used to be located. She reported both men had guns and provided physical descriptions of the men. Officer Ulin testified that the wounds to

Leon's head were consistent with being struck by a firearm, which he referred to as "pistol-whipping."

While Officer Ulin stayed with Leon, Officer Ryan Neumann canvased the area. He encountered two individuals in the apartment's parking lot who advised him that a "large black man with dreads" had run through the lot shortly before the officer's arrival, matching the previous description provided by Leon. He followed the path they directed him on, eventually encountering a woman sitting in a vehicle. She informed Officer Neumann that she had seen multiple males running away, carrying something large.

Officer Dustin Wing and K-9 Bingo picked up a scent around Leon's apartment and followed it to another apartment building about a block-and-a-half away. The path Bingo took was similar to the one described by witnesses as to the direction where one or more men had fled. Bingo alerted at the front of unit 6 of the apartment building. A man emerged from the apartment, said, "Oh shit," and quickly shut the door. Officer Wing was able to see multiple men and one female inside the apartment. One of the men was large, shirtless, and had a hairstyle similar to the one described by previous witnesses. Officer Wing testified the man's appearance was consistent with that of Magang. Several of the apartment's occupants demanded a police supervisor be present.

Officer Neumann moved toward a main road to flag down his supervisor. While doing so, he noticed Magang moving through a tree line area. Magang fit the description provided by witnesses. Magang informed Neumann that he was urinating in this area because he was drunk. He reported he was staying at his girlfriend's home in the area, although he could not provide an address. Neumann

searched Magang, finding about $260 in cash as well as multiple credit cards. Two of the cards belonged to Leon. Magang was arrested.

The State charged Magang with first-degree robbery and first-degree burglary. Trial was held August 2 and 3, 2021. Leon did not testify, citing the trauma further involvement in the case would cause her. The jury found Magang guilty of second-degree robbery, in violation of Iowa Code section 711.3 (2019), and first-degree burglary, in violation of section 713.3.

Magang filed a motion for a new trial. Magang's motion for new trial claimed the verdict was contrary to the law or evidence. The motion for a new trial also claimed the jury was tainted. He also filed a motion in arrest of judgment, asserting the same claims as his motion for a new trial. The court denied both motions. Magang was sentenced to ten years in prison for the robbery conviction and twenty-five years in prison for the burglary conviction. The district court ordered the burglary and robbery sentences to run consecutively. Magang appeals.

## II.   Discussion

Magang contests the admissibility of Officer Ulin's body camera footage. He also claims evidence was insufficient to support either of his convictions. He claims the court used the wrong standard when considering his motion for new trial. And he contends the court abused its discretion during sentencing.

### A.   Bodycam Footage

Magang challenges the admissibility of Officer Ulin's body camera footage. He asserts Leon's statements were inadmissible hearsay. He also claims the footage is unduly prejudicial. The district court found Leon's statements in Officer Ulin's body camera footage were admissible pursuant to the excited utterance

exception to the hearsay rule.  The admissibility of evidence is generally reviewed for an abuse of discretion.  *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021).  "We review hearsay claims, however, for corrections of errors at law.  The correction for errors at law standard is applicable in determining whether evidence that would generally be prohibited as hearsay comes in under a hearsay exception."  *Id.* (internal citation omitted).

### 1.    Hearsay

Leon's statements to Officer Ulin, including statements describing the suspects and the fact that they stole her safe, are hearsay, meaning an out of court assertion used to prove the truth of the matter asserted.  *See id.* at 599; Iowa R. Evid. 5.801(c).  Thus, the admissibility of those statements turns on whether an exception to hearsay applies.  *See* Iowa R. Evid. 5.802.  The district court cited the excited utterance exception to hearsay when it found Leon's statements admissible.  *See id.* 5.803(2).  That exception permits a court to admit hearsay statements "relating to a startling event or condition, made while the declarant was under the stress of excitement [that it] caused."  *Id.*  To determine the applicability of the exception, we consider:

> (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*State v. Atwood*, 602 N.W.2d 775, 782 (Iowa 1999).

Upon our review of the *Atwood* factors, we conclude Leon's statements were admissible as an excited utterance.  First, Leon called 911 immediately after the robbery.  Six minutes later, Officer Ulin arrived and began his interaction with

Leon—the recording of which is about ninety seconds. Relating events that happened less than ten minutes ago supports the conclusion that Leon was still acting under the stress of the robbery. *See Dessinger*, 958 N.W.2d at 601 ("While time-lapse is important, statements made hours and even days after the event have been admissible."). Second, Leon's statements were made without prompting. *See State v. Harper*, 770 N.W.2d 316, 320 (Iowa 2009) (noting that statements spontaneously given were more likely to fall under the excited utterance exception). She made those statements after Ulin had directed her to take a seat—a direction not likely to prompt a response involving details of the crime.

We also highlight Leon's condition while she was making her statements to Ulin. Leon had observable wounds to her head. As visible on the body camera footage, she was dazed and somewhat confused, repeatedly calling out and searching for her missing cat rather than addressing Ulin directly. She struggled to form words or follow Ulin's instructions. It is evident she was still reeling from the robbery. Leon was under the stress of the event, and her challenged statements were admissible under the excited utterance exception to the hearsay rule.

### 2. Relevance

Magang also claims the video was more prejudicial than probative. In particular, Magang contends the video is likely to inflame the jury's passion by exhibiting Leon's wounds and confused mannerisms. He also asserts the video is unnecessarily cumulative to other evidence, including photos of Leon's injuries and her 911 call.

Evidence must be relevant to be admissible. *See* Iowa R. Evid. 5.402; *see also* Iowa R. Evid. 5.401 (defining relevance). However, relevant evidence may still be inadmissible. In particular, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403. To determine whether evidence is inadmissible under rule 5.403, we utilize a two-part test. *State v. Neiderbach*, 837 N.W.2d 180, 202 (Iowa 2013). "First, we 'consider the probative value of the evidence.' Second, we balance the probative value 'against the danger of its prejudicial or wrongful effect upon the triers of fact.'" *Id.* (quoting *State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013)).

We conclude Ulin's body camera footage was relevant. In particular, it showed the physical effects of the assault on Leon, including bleeding from a head wound. The camera also corroborates Leon's statements in the 911 call, including identifying that a safe was stolen and that "both"—indicating multiple—men were armed during the burglary. That statement also corroborates other witnesses' statements to police that indicated multiple men fled the scene while carrying something large. The corroboration of Leon and the other witnesses' statements is particularly important given the fact that Leon never directly identified Magang as a perpetrator.

Magang's claim comes down to whether the footage was unduly prejudicial or unnecessarily cumulative.

> All "[r]elevant evidence is inherently prejudicial in the sense of being detrimental to the opposing party's case." *State v. Delaney*, 526 N.W.2d 170, 175 (Iowa Ct. App. 1994). The relevant inquiry is not

> whether the evidence is prejudicial or inherently prejudicial but whether the evidence is unfairly prejudicial. Unfairly prejudicial means the "evidence has an undue tendency to suggest a decision on an improper basis." *Id.* The evidence here does not suggest a decision on an improper basis.

*State v. Thompson*, 954 N.W.2d 402, 408 (Iowa 2021).

We conclude the video is not unfairly prejudicial. It is true that the video's contents are similar to other evidence, including Leon's 911 calls and photographic evidence of her injuries. But the video also offers unique evidence, including Leon demonstrating where the safe was located, suggesting her claim's credibility. It corroborates her and other witnesses' testimony suggesting multiple men with weapons broke into her home and assaulted her. And the footage of her injuries, seen mere minutes after the robbery, suggests a causal connection to the burglary that photographs alone may not convey.

Finally, it is true the images of Leon injured and in distress may pull on the jury's emotions. But that alone does not render evidence inadmissible. "[P]hotographs are not inadmissible simply because they are 'gruesome or may tend to create sympathy . . . if there is just reason for their admission.'" *Neiderbach*, 837 N.W.2d at 202 (second alteration in original) (citation omitted). As explained, the video includes key details implicating Magang. The evidence was not unfairly prejudicial.

### B.     Sufficiency of the Evidence

Magang challenges the sufficiency of the evidence for both of his convictions. In particular, Magang points to the fact that Leon never affirmatively identified Magang as the perpetrator, calling into question his identity as one of the men in the robbery-burglary.

"We review the sufficiency of the evidence for correction of errors at law."
*State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022) (citation omitted).  Our review is "highly deferential to the jury's verdict."  *Id.*

> The jury's verdict binds this court if the verdict is supported by substantial evidence.  Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.  In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all "legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence."

*Id.* (internal citations omitted).

We find sufficient evidence supports Magang's convictions.  Leon told the 911 dispatcher and Officer Ulin that two men entered her apartment with guns and stole her safe.  Two witnesses in the parking lot observed a man matching Magang's description flee the scene.  Another witness—who was in the direction that the initial witnesses indicated the suspect was running toward—observed multiple men carrying something large.  Bingo tracked the suspect's scent to the apartment complex, where Officer Wing observed a man matching Magang's description.

Magang was found with two of Leon's credit cards in his pocket within an hour of the robbery.  He was also only a block away from the crime scene.  Upon being searched, Magang claimed the contents of his pockets were his own, exclaiming that he was "a working man."  Magang offered no explanation for having Leon's credit cards within such a short time frame of the robbery.

It is true that there was no physical evidence such as DNA or fingerprints tying Magang to the crime scene.  Nor was there an affirmative identification of

Magang as a perpetrator by Leon. Because of that, Magang claims he was guilty of nothing more than possession of stolen property. But the State is under no obligation to present direct evidence of a suspect's guilt. *State v. Jones*, 967 N.W.2d 336, 342 (Iowa 2021). "What the State is required to do is convince the jury beyond a reasonable doubt of the defendant's guilt. Direct and circumstantial evidence are equally probative in that regard." *Id.* The State presented circumstantial evidence suggesting Magang was present during the robbery, offered a chain of witnesses tracing his path from the crime scene to the apartment complex where he was eventually found, and demonstrated Magang had possession of the contents of Leon's safe within an hour of the robbery. The jury could reasonably conclude he was one of the perpetrators. The evidence was sufficient.

### C.     Motion for New Trial

Magang claims the district court utilized the wrong standard when it ruled on his motion for a new trial. Magang highlights that the district court concluded there was "sufficient evidence" to convict the defendant. Magang contends the court improperly used the sufficiency of the evidence standard rather than the weight of the evidence standard. *See State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998) (describing the difference between the two standards).

Under Iowa Rule of Criminal Procedure 2.24(2)(b)(6), a court has the discretion to grant a new trial "[w]hen the verdict is contrary to law or evidence." Iowa R. Crim. P. 2.24(2)(b)(6). In *Ellis*, the Iowa Supreme Court distinguished between the standard to be applied in evaluating motions for a judgment of acquittal during trial—evidence sufficient that a rational jury could convict the

defendant beyond a reasonable doubt—and the standard to be applied in evaluating motions for a new trial—evidence that a greater amount of credible evidence supports one side of an issue.  578 N.W.2d at 658.  The *Ellis* standard requires the trial court to examine issues of credibility in assessing whether a new trial is appropriate on the ground that the verdict was contrary to the weight of the evidence.  *Id.*

Our supreme court has "caution[ed] trial courts to exercise this discretion carefully and sparingly when deciding motions for new trial based on the ground that the verdict of conviction is contrary to the weight of the evidence."  *Id.* at 659.

> Except in the extraordinary case where the evidence in this case preponderates heavily against the verdict, trial courts should not lessen the jury's role as the primary trier of facts and invoke their power to grant a new trial.  A trial court should not disturb the jury's findings where the evidence they considered in nearly balanced or is such that different minds could fairly arrive at different conclusions.

*State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

We conclude the district court utilized the proper standard for the motion for a new trial.[1]  The court acknowledged both of Magang's post-trial motions.  The court began its analysis by addressing Magang's claim related to "the lack of evidence or contrary to the evidence," stating that the evidence of guilt was overwhelming.  When reviewing the transcript from the hearing on the post-trial motions as a whole, the record reflects that the court considered and used the proper standard for the motion for a new trial, a weight of the evidence claim.  While the court did not use the terminology "weight of the evidence," the court highlighted

---

[1] Magang does not appeal the portion of the motion for a new trial in relation to his claim concerning the juror.

Officer Ulin's body camera footage as "compelling and was certainly sufficient to draw attention to Mr. Magang." The court considered the strength of that piece of evidence in the jury's ability to tie Magang to the crime. The court also highlighted that Magang was found near the crime scene with proceeds from the robbery, strong evidence that Magang was involved. The court was clear, "the evidence was overwhelming because . . . the strength of the State's evidence." The court appropriately considered Leon's credibility and the strength of other evidence. *See State v. Fortune*, No. 16-0360, 2017 WL 2875866, at \*4 (Iowa Ct. App. July 6, 2017) ("The district court made no indication it viewed the evidence in the light most favorable to the verdict. In addition, the district court concluded the evidence was overwhelming, indicating an assessment of the weight of the evidence."). We determine the court considered the correct standard concerning Magang's motion for a new trial.

### D.    Sentencing

Magang claims the district court wrongly imposed consecutive sentences for his burglary and robbery convictions. In particular, Magang highlights the offenses stem from the same act. He makes a general assertion that imposing consecutive sentences "was unduly harsh."

"Our review of a sentence imposed in a criminal case is for correction of errors at law. We will not reverse the decision of the district court absent an abuse of discretion or some defect in the sentencing procedure." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002) (internal citation omitted). A "particular sentence within the statutory limits is cloaked with a strong presumption in its favor." *Id.*

When a person is convicted of multiple offenses, the district court has the discretion to impose consecutive or concurrent sentences. Iowa Code § 901.8.

In support of his claim, Magang cites to the proposition that consecutive sentences are only permissible when each conviction is premised on a "[s]eparate and distinct offense." *See State v. Criswell*, 242 N.W.2d 259, 260 (Iowa 1976). Magang asserts the convictions are premised on the same act, implying they were the same offense for sentencing purposes.

We disagree with Magang's contentions. Our supreme court has rejected similar arguments, including in *Criswell*. *See id.* (explaining that convictions may be run consecutively when the offenses were committed in the same occurrence); *see also State v. Taylor*, 596 N.W.2d 55, 57 (Iowa 1999) (finding that the court did not abuse its discretion in ordering consecutive sentencing despite the offenses being factually intertwined). We look to the elements of the crimes, not the circumstances underlying them, to determine if the two convictions are premised on distinct offenses. Robbery and burglary are distinct offenses with separate elements.[2] The court had the discretion to impose consecutive sentences.

The district court must expressly state its reasons for imposing consecutive sentences. *State v. Hill*, 878 N.W.2d 269, 275 (Iowa 2016). The court noted the separate and serious nature of the offenses and in imposing sentences explained:

> The assault committed on the victim here was nothing short of heinous, brutal, and unquestionably destroyed her sense of security in her own home. Your [pre-sentence investigation report], your criminal history[3], is such that you have exhausted the State's ability

---

[2] Magang does not assert the offenses should merge.
[3] Magang was convicted in 2009 for three counts of robbery in the second degree and one count of ongoing criminal conduct. He was placed on parole in November 2018.

and the system's ability to provide you with rehabilitation outside the prison setting.

So because of those reasons, Mr. Magang, those sentences shall be run consecutive to each other for a total period not to exceed 35 years.

The court considered appropriate factors when it ordered consecutive sentences.[4]

We determine no abuse of discretion by the district court in the sentencing hearing and imposing sentences.

**AFFIRMED.**

---

[4] "Sentencing courts should . . . explicitly state the reasons for imposing a consecutive sentence, although in doing so the court may rely on the same reasons for imposing a sentence of incarceration." *Hill*, 878 N.W.2d at 275. Here, the sentencing court cited the separate and serious nature of the crimes when imposing consecutive sentences. The court's written sentencing order highlighted the same factors.