# IN THE COURT OF APPEALS OF IOWA

No. 23-0969
Filed October 2, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JORDAN DEEANDREW WEBB,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Webster County, Angela L. Doyle (pretrial ruling) and Christopher C. Polking (motion in limine, trial, and sentencing), Judges.

A defendant appeals his convictions for second-degree sexual abuse, incest, and child endangerment. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Joshua Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Tabor, C.J., and Chicchelly and Sandy, JJ.

**TABOR, Chief Judge.**

A jury found Jordan Webb guilty of sexual abuse in the second degree, incest, and child endangerment for committing a sex act with his four-year-old daughter, E.W., in the spring of 2022. Webb appeals, contesting the sufficiency of the evidence supporting his convictions. He also renews his hearsay objection to the admission of E.W.'s statements to a nurse practitioner at a child protection center. In another evidentiary challenge, he urges that any probative value of that testimony was substantially outweighed by the danger of unfair prejudice. Next, he claims that the district court abused its discretion in denying his mistrial motion after the prosecutor made improper comments during closing arguments. Lastly, he contends that his convictions were contrary to the weight of the evidence. After a careful review of Webb's claims, we find no grounds to reverse his convictions or grant a new trial.

## I.      Facts and Prior Proceedings

E.W.'s mother, Abigail, noticed that her daughter had unusual vaginal discharge on about April 1, 2022. She took E.W. to her primary care provider, Shannon Fecher, for an examination on April 4. During the examination, Fecher observed discharge in E.W.'s inner labia and took a culture swab for testing. Four days later, the test results came back positive for gonorrhea. Fecher notified Abigail of the diagnosis and reported it to the Iowa Department of Health and Human Services.

Larry Hedlund, an investigator with the Webster County Attorney's Office, interviewed Webb on April 11. Webb told Hedlund that he, his wife Abigail, their daughter E.W., and their younger son were in St. Lucia doing missionary work until

March 1. The family was then in California for three weeks before Abigail and the children flew home to Iowa on March 21. Webb joined them on March 22.

Webb also told Hedlund that he tested positive for gonorrhea in his throat and rectum. He thought he became infected when he spent the night "with some random person" in Salt Lake City on March 21, after he separated from his family on the way home to Iowa from California and his flight was delayed. Webb explained that he was sick on March 26 and within the next couple days he developed painful sores in his mouth. He was tested on April 1, and he received positive test results for gonorrhea on April 5. Webb stated that he did not know how E.W. became infected, denied ever having inappropriate contact with her, and speculated that she may have been infected by shared towels.

The State charged Webb with sexual abuse in the second degree in violation of Iowa Code sections 709.1, 709.3(1)(b), and 903B.1 (2022); incest in violation of Iowa Code sections 726.2 and 903B.2; and child endangerment in violation of Iowa Code section 726.6(1)(a), (4), and (8). Webb pleaded not guilty and proceeded to jury trial.

The State decided not to call E.W. to testify. But her mother, Abigail, testified that Webb was often around E.W. between March 22 and March 29 after they had returned to Iowa. The family lived together, and Webb was sometimes alone with E.W. The family took a trip to Nebraska from March 29 to March 31. They stayed overnight with family members on March 29 and at a motel on March 30. Abigail stated that Webb, E.W., and their son took a bath together while wearing swimsuits on March 30 after swimming in the motel pool in Nebraska. The family returned to Iowa on March 31.

Webb first told Abigail that he thought he was infected with gonorrhea "by sharing water bottles with people he played sports with in St. Lucia." Then on April 10, Webb confessed to Abigail that "he had been unfaithful." Abigail was tested for gonorrhea the next day. Their son was also tested. Abigail and the son both tested negative.

Julie Ritland, a nurse practitioner, conducted a medical examination of E.W. at a child protection center (CPC) on April 11, 2022. She knew that E.W. had tested positive for gonorrhea. At the beginning of the examination, Ritland asked E.W. why she was at the CPC to see her. Over Webb's objection, Ritland testified that E.W. replied: "God knows. You can ask God. He knows everything." E.W. also "described her underwear being wet." When Ritland asked E.W. "if anything happened to that part of her body," E.W. replied: "I don't know, but if you pray about it, God might tell you, but I can't tell you." To follow up, Ritland asked why she could not tell; E.W. replied: "because I can't tell." After that, E.W. "wouldn't engage in any further discussion about her [genital/urinary] system." Ritland then performed a "head to toe" examination of E.W.—noting no other areas of concern. Ritland testified that she wore gloves during the exam, per protocol, but she was not worried about contracting gonorrhea because "[i]n its typical form it's sexually transmitted, and I did not fear that."

Dr. Regina Torson, the medical director of another CPC, provided expert testimony for the State about the sexual transmission of gonorrhea.[1] Dr. Torson also testified about the incubation period for gonorrhea infections:

---

[1] Webb did not call an expert witness.

> [T]here's an incubation period from the time of contact to becoming infective, and also when symptoms might develop. Generally speaking, within a couple of weeks someone would develop symptoms if they're going to develop symptoms. Infectivity can occur in as little time as a day, but it usually does take two to five days before someone can then transmit the infection to another person.

Dr. Torson noted that if Webb and E.W. became symptomatic around the same time, it was "more likely . . . there's some proximity in time of when they both contracted it."

Webb did not testify. At the end of his case-in-chief, the defense introduced video excerpts of a deposition of E.W. taken on February 24, 2023. During closing arguments, the prosecutor commented on E.W.'s statements to Ritland at the CPC compared to her statements in the deposition. Webb did not object at that time. Webb objected during the State's rebuttal when the prosecutor argued that E.W.'s deposition testimony "was months after [her CPC examination]. And we have no idea who [E.W.] was around, if anyone told her what to say, told her how to act." The court then instructed the jury to "make your decision based on the evidence as you remember it and instructions of law given to you by the court and not upon any speculation." Webb moved for mistrial based on the prosecutor's comments, which the court denied.

The jury found Webb guilty as charged on all counts. Webb moved for a new trial, alleging that the verdicts were against the weight of the evidence. The court denied his motion and sentenced him to concurrent terms of incarceration totaling twenty-five years, with a minimum 70% term, and a lifetime special sentence for sexual abuse in the second degree. Webb appeals.

**II.     Scope and Standards of Review**

We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Cook*, 996 N.W.2d 703, 708 (Iowa 2023).  "We consider all evidence, not just the evidence supporting the conviction, and view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'"  *State v. Ernst*, 954 N.W.2d 50, 54 (Iowa 2021) (citation omitted).  Substantial evidence exists if the record "would convince a rational fact finder the defendant is guilty beyond a reasonable doubt."  *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022) (citation omitted).  "Evidence which merely raises suspicion, speculation, or conjecture is insufficient."  *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992).

We review most evidentiary rulings for abuse of discretion.  *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017).  But hearsay rulings are an exception; we review them for correction of errors at law.  *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021).  We view the admission of hearsay as prejudicial to the resisting party unless the offering party can show harmless error.  *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011).

We review the denial of a motion for mistrial for an abuse of discretion.  *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017).  Likewise, we review the denial of Webb's motion for new trial asserting the verdicts were contrary to the weight of the evidence for an abuse of discretion.  *See State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).

**III.    Analysis**

**A.    Sufficiency of the Evidence**

Webb contends that the evidence was insufficient to support his convictions.

First, to convict Webb of sexual abuse in the second degree, the State had to

prove:

> 1. On or about March 1 through April 8, 2022, Webb performed a sex act with E.W.
> 2. The sex act was performed either wholly or partially in the State of Iowa.
> 3. Webb performed the sex act while E.W. was under the age of 12 years.

Second, to convict Webb of incest, the State had to prove:

> 1. On or about March 1 through April 8, 2022, Webb performed a sex act with E.W.
> 2. The sex act was performed either wholly or partially in the State of Iowa.
> 3. At such time of the sex act, Webb and E.W. were related to each other as father and daughter.
> 4. At such time, Webb knew they were so related.

Third, to convict Webb of child endangerment, the State had to prove:

> 1. On or about March 1 through April 8, 2022, Webb was the parent of E.W.
> 2. E.W. was under the age of 14 years.
> 3. Webb acted with knowledge that he was creating a substantial risk to E.W.'s physical, mental, and/or emotional health or safety.
> 4. Said actions occurred either wholly or partially in the State of Iowa.

Both sexual abuse in the second degree and incest require the commission

of a sex act as an element.  *See* Iowa Code §§ 709.1, 709.3, 726.2.  On the child

endangerment count, the State argued that if the jury found Webb committed a sex

act with E.W., that would prove the element that Webb "acted with knowledge that

he was creating a substantial risk to E.W.'s physical, mental, and/or emotional health or safety." *See id.* § 726.6(1)(a).

Webb's challenge to the sufficiency of the evidence is twofold. First, he challenges the State's proof that he committed a sex act with E.W. Second, he argues that even if the State carried its burden to prove that element, it failed to prove a sex act occurred in Iowa.

In his first challenge, Webb emphasizes three facts: (1) his denial of any sexual contact with E.W. during his interview with investigator Hedlund; (2) E.W.'s answers during her deposition of "I don't know" and later "no" when asked if Webb had ever touched her vagina with his hands, mouth, or tongue;[2] and (3) testimony from Ritland and Torson that nonsexual transmission of gonorrhea from contact with infected material is possible (though both testified gonorrhea is typically transmitted through sexual contact). Webb also contends that the State did not establish that Webb and E.W. had the same strain of gonorrhea. He also claims that the record left room for alternative sources of E.W.'s infection, including contact with other children, unsanitary conditions in St. Lucia, and nonsexual transmission through bathing together or shared towels. And Webb claims E.W.'s statement to Ritland that "God knows" what happened was the child mimicking a common phrase used by family members when they did not know an answer to a question.[3]

---

[2] The district court admitted the video recording of E.W.'s deposition as impeachment evidence under Iowa Rule of Evidence 5.806, not as substantive evidence, but gave no limiting instructions to the jury.

[3] This claim is based on Abigail's testimony during a pretrial motions hearing. The jury did not hear this testimony.

It is true the State lacked direct proof that Webb committed a sex act with E.W. But it presented solid circumstantial evidence from which the jury could reasonably infer such an act occurred. "[D]irect and circumstantial evidence are equally probative for the 'purposes of proving guilt beyond a reasonable doubt.'" *State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008) (citation omitted). "A defendant may be convicted solely on circumstantial evidence if it is sufficiently compelling to convince a judge or jury of the defendant's guilt beyond a reasonable doubt." *Tipton*, 897 N.W.2d at 692.

The State's key evidence of sexual contact between Webb and E.W. was Dr. Torson's expert testimony. Dr. Torson explained to the jury that gonorrhea is a sexually transmitted infection, meaning it is "transmitted through contact with body fluids generally passed or shared through intimate contact" with a "mucosal surface of the body," such as "the vagina, the penis, the mouth, [or] the anus." While she testified that nonsexual transmission through contact with an object containing infected fluid is theoretically possible, she also explained that this method of transmission is unlikely to occur in real-world conditions. "Gonorrhea does not live outside of the body for long periods of time" and "dies rapidly" if the fluid containing the bacteria dries out, according to the expert.

Moreover, Dr. Torson testified that it was unlikely an adult with gonorrhea could pass the infection to a child while helping them use the toilet, by sharing water bottles or towels, or while swimming or taking a shared bath wearing

swimsuits.[4]   She had seen nothing in her training or experience where those modes of transmission had ever occurred.   Dr. Torson saw positive tests for gonorrhea in children "maybe six or less times" in her experience, and she never saw a case of non-sexually transmitted gonorrhea in her years working at the CPC, in family practice and urgent care, and in an STD clinic.

From Dr. Torson's testimony, the jury could reasonably infer that E.W. contracted gonorrhea through sexual contact with an infected person.   And the only infected person E.W. was known to have had contact with was Webb.   *See Ernst*, 954 N.W.2d at 59 (allowing juries to make reasonable inferences based on circumstantial evidence).   The jury was free to reject Webb's suggestions about potential alternative sources of E.W.'s infection as unreasonable.   *See State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019) ("The jury is entitled to reject a party's evidence and credit the evidence against it."); *see also Bentley*, 757 N.W.2d at 262 ("[T]he prosecution does not have 'an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.'" (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979))).   The jury was also free to disbelieve both Webb's denial of having inappropriate contact with E.W. and E.W.'s deposition answers when she was asked whether Webb ever touched her inappropriately.   *See State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014) ("Our system of justice vests the jury with the function of evaluating a witness's credibility.").

---

[4] The jury also heard that neither Abigail nor E.W.'s younger brother—who also bathed with Webb and E.W. at the motel in Nebraska—tested positive for gonorrhea.

And the jury heard that Webb had oral gonorrhea and E.W. had vaginal gonorrhea. Direct contact between an infected person's mouth and another person's vagina is the type of "intimate contact" with a "mucosal surface of the body" that can cause sexual transmission of gonorrhea, according to Dr. Torson. Finally, the jury was instructed that a "sex act" includes "any sexual contact . . . [b]etween the mouth of one person and the genitals of another." *See* Iowa Code § 702.17(2).

Beyond the scientific evidence on gonorrhea transmission, the State offered nurse Ritland's testimony that when asked if anything happened to her, E.W. said, "I don't know, but if you pray about it, God might tell you, but I can't tell you." In closing, the State asked the jury to consider why E.W. would say she couldn't tell what happened and suggested that the jury "give those statements the weight you think they deserve." While E.W.'s statements about God did not directly implicate her father, they did expose her reluctance to engage with the investigation into her gonorrhea infection. The jury could believe that E.W.'s statements supported the State's allegations.[5]

Thus, viewing the totality of the evidence and drawing all legitimate inferences in the light most favorable to the State, we conclude that a rational jury could find beyond a reasonable doubt that Webb committed a sex act with E.W.

Moving to Webb's second challenge, he argues the State failed to prove that he committed a sex act with E.W. in Iowa, an essential element of each

---

[5] For sufficiency purposes, we consider all evidence presented at trial even if wrongly admitted. *State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

offense.[6]  He claims that the State could not establish when E.W. contracted gonorrhea and she could have been infected and asymptomatic before the family returned to Iowa.

To prove territorial jurisdiction, the State relies on the timeline of events leading up to E.W.'s infection.  Webb told investigator Hedlund that he believed he contracted gonorrhea in Salt Lake City on March 21.  He then flew to Iowa to rejoin his family on March 22 and started developing symptoms shortly after March 26.  That chronology aligns with Dr. Torson's testimony that "within a couple of weeks someone would develop symptoms if they're going to develop symptoms," and "it usually . . . takes[s] two to five days before someone can then transmit the infection to another person."

Meanwhile, E.W. began experiencing vaginal discharge, a symptom of gonorrhea, around April 1.  From this evidence, the jury could reasonably infer that the incubation period of E.W.'s infection began sometime between March 22 and March 29—after Webb rejoined the family in Iowa but before their trip to Nebraska.  Plus, the jury could credit Abigail's testimony that Webb would have been alone at times with E.W. while they were in Iowa during that timeframe.

The jury could also reasonably infer that the incubation period of E.W.'s infection coincided with the timeframe when Webb became infective, based on Dr. Torson's testimony that if someone was infected on March 21, they could transfer the infection "as soon as the 22nd, but more traditionally it would probably

---

[6] "Territorial jurisdiction to prosecute a criminal offense . . . is an essential element of every crime, and the Due Process Clause of the Fourteenth Amendment of the United States Constitution requires the State to prove it beyond a reasonable doubt."  *State v. Serrato*, 787 N.W.2d 462, 468 (Iowa 2010).

be between the 23rd and the 27th." Moreover, the jury could reasonably rely on Dr. Torson's testimony that if Webb and E.W. became symptomatic at around the same time, it was "more likely . . . there's some proximity in time of when they both contracted it" than that either of them had an infection "from a long time ago now showing up." Based on these facts and legitimate inferences drawn from them, the jury could reasonably conclude that E.W.'s gonorrhea symptoms appeared on about April 1 because Webb committed a sex act with her in Iowa sometime between March 22 and March 29. *See Serrato*, 787 N.W.2d at 470–72 (explaining that inferences from circumstantial evidence can prove territorial jurisdiction, including those drawn from a "short timeline" suggesting certain events happened in Iowa).

In sum, the State presented substantial evidence that Webb committed a sex act with E.W. and that the sex act occurred in Iowa. The State's proof did more than create speculation, suspicion, or conjecture. Instead, the State offered scientific evidence confirming the likelihood that a young girl with vaginal gonorrhea contracted it from sexual contact with her father who had oral gonorrhea in the same timeframe. That circumstantial evidence was sufficient to convince a jury of Webb's guilt beyond a reasonable doubt. We thus affirm his convictions.

**B.      Hearsay: E.W.'s Statements to Ritland**

Webb also argues that the district court erred in admitting E.W.'s statements to Ritland during her examination at the CPC under the medical diagnosis or treatment exception to the rule against hearsay. *See* Iowa R. Evid. 5.803(4). On appeal, the State does not defend admission of these statements under the

medical treatment exception. Instead, the State contends that the statements were not hearsay in the first place.

"Hearsay 'is a statement, other than one made by the declarant while testifying at the trial . . . offered in evidence to prove the truth of the matter asserted.'" *Dullard*, 668 N.W.2d at 589 (quoting Iowa R. Evid. 5.801(c)). "Hearsay is not admissible unless it is exempt from the rule or falls within one of the exceptions." *Id.* (citing Iowa R. Evid. 5.802). In *Dullard*, our supreme court held that "[i]mplied assertions from speech intended as communication clearly come within the definition of a statement under rule 5.801(a)(1)." *Id.* at 594–95. The court explained: "[W]e do not believe indirect or unintentional assertions in speech are reliable enough to avoid the hearsay rule. We think the best approach is to evaluate the relevant assertion in the context of the purpose for which the evidence is offered." *Id.* at 595 (footnote omitted). Under that approach, some utterances that do not appear to be hearsay on their face still qualify as hearsay if they are offered to prove the truth of an implied assertion. *See id.* at 590–95.

At issue here are E.W.'s responses to Ritland that "God knows" why she was being seen at the CPC but that E.W. couldn't tell her. Citing *Dullard*, Webb argues that E.W.'s statements were hearsay because the State offered them to prove the truth of two underlying implied assertions: something had in fact happened to E.W. that was relevant to the CPC examination, and someone instructed E.W. not to tell anyone what it was. *See id.*

The State agrees that E.W.'s statements were not offered to prove their facial truth (that God in fact knew why E.W. had vaginal discharge and she did not know or could not say what happened) but "to show that these were strange

responses that tended to suggest that something *did* happen to [E.W.]'s vagina and that someone told [E.W.] that she should refuse to answer questions about it." But the State argues *Dullard* does not apply here because E.W.'s statements were offered to support natural and logical *inferences* the jury could draw from what E.W. said, not to prove the truth of any matter E.W. herself *impliedly asserted*. Thus, according to the State, none of E.W.'s statements to Ritland were hearsay, so it was unnecessary for the district court to determine whether they met the medical treatment exception.

The State's argument that it offered E.W.'s statements for the "non-asserted inferences" that something happened to her and someone told her not to tell—rather than "implied assertions" that those two things were true—raises a distinction without a difference. The State focuses on E.W.'s intent in making the statements instead of the purpose for which the State admittedly offered them. But in *Dullard*, the court directed us to evaluate indirect assertions by looking to the purpose for which the party offers that evidence. *Id.* at 595. We agree with Webb that the State offered E.W.'s statements to prove the truth of the implied assertions described above. Therefore, they were hearsay and should not have been admitted unless they met an exception to the hearsay rule.

One exception to the hearsay rule is "[a] statement that . . . [i]s made for—and is reasonably pertinent to—medical diagnosis or treatment; and . . . [d]escribes medical history, past or present symptoms or sensations, or the inception or general cause of symptoms or sensations." Iowa R. Evid. 5.803(4). "The primary focus is on the declarant's motive for making the

statement." *State v. Skahill*, 966 N.W.2d 1, 9 (Iowa 2021). The district court ruled that E.W.'s statements to Ritland were admissible under this exception.

Webb argues that the district court was incorrect, because the State failed to show that E.W.'s motive in making the statements was consistent with the purposes of medical treatment or that the statements were of a nature reasonably relied on by a physician in diagnosis or treatment. *See id.* at 8. He asserts that the court wrongly focused on Ritland's motivation in asking the questions which prompted E.W.'s statements, rather than the content of the statements and E.W.'s motive in making them. On appeal, the State concedes that the district court "never found that [E.W.] made those statements with the intent to seek diagnosis or treatment" and instead argues that "[t]here was no reason to try to fit this square peg into Rule 5.803(4)'s round hole."

We agree that the district court erred in admitting E.W.'s statements to Ritland under the medical treatment exception. But our analysis does not end there. We presume the admission of hearsay over a proper objection is prejudicial to the resisting party unless the offering party can establish harmless error. *Elliott*, 806 N.W.2d at 669. Harmless error "is affirmatively established if the record shows the hearsay evidence did not affect the jury's finding of guilt." *Id.*

As detailed above, the other evidence supporting Webb's convictions was substantial. Moreover, as the State pointed out in oral arguments, the admission of E.W.'s hearsay statements opened the door for Webb to introduce E.W.'s deposition testimony—in which she denied that Webb had touched her vagina with his hands, mouth, or tongue. *See* Iowa R. Evid. 5.806. In his appellant's brief, Webb described that deposition as "the worst fact for the State's case." And as

we will discuss below, the probative value of E.W.'s statements was not substantially outweighed by the danger of unfair prejudice to Webb. Thus, the State has met its burden to prove any error in admitting E.W.'s hearsay statements was harmless.

## C.     Probative Value Versus Danger of Unfair Prejudice

Webb next argues the district court should have barred Ritland's testimony describing E.W.'s statements because any probative value was outweighed by the danger of unfair prejudice. We review this ruling for an abuse of discretion. *Tipton*, 897 N.W.2d at 690. "An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (cleaned up). Even if the court abused its discretion, we will not reverse unless there is a showing of prejudice. *Id.*

Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence. Iowa R. Evid. 5.401. Relevant evidence is generally admissible. Iowa R. Evid. 5.402. But "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403.

"We employ a two-part test to decide whether evidence should be excluded under rule 5.403." *State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013). We consider its probative value weighed against the danger of its wrongful effect on the jurors. *Id.* We exclude evidence only if the unfair prejudice substantially outweighs the probative value. *Id.* Webb must prove the court abused its

discretion in balancing these factors. *See State v. Liggins*, 978 N.W.2d 406, 418 (Iowa 2022).

Webb argues that E.W.'s statements to Ritland were facially ambiguous and relevant only if the jury accepted the State's claim about their implied assertions: something happened to E.W., and she was coached not to tell anyone. So, Webb contends E.W.'s statements had no probative value aside from triggering improper speculation as to their meaning and the district court should have excluded them under Iowa Rules of Evidence 5.402 and 5.403.

In admitting the statements over Webb's objections, the district court reasoned that the fact evidence "is subject to two or more plausible interpretations does not automatically make it misleading or confusing or prejudicial." The court elaborated in its motion-in-limine ruling:

> While the statements of the child to Ritland are ambiguous, that is not the same as saying that they have no probative value whatsoever. The statement may mean that the child was instructed not to tell. That would not only be relevant, but highly probative. The statement may also mean that the child can't tell because she doesn't know, however, since God knows everything, he could tell you, but she can't. That statement is also relevant and probative, but this time in favor of the defendant and not the State. Thus, both interpretations are relevant and with good probative value, but which side benefits most depends on the interpretation. The fact finder, looking at the statement in conjunction with the entire record, would be in the best position to make that determination.

As the district court explained, the statements were relevant and subject to competing interpretations—favorable to both Webb and the State—which the jury was entitled to make. The district court's reasoning was sound, and we find no abuse of discretion in its decision to admit E.W.'s statements to Ritland over Webb's rule 5.403 objection.

**D.    Mistrial: Prosecutorial Misconduct**

Webb next argues the district court erred in denying his motion for mistrial after the prosecutor implied during the closing and rebuttal arguments that someone influenced E.W. to deny inappropriate contact with Webb in her deposition testimony. The prosecutor first compared E.W.'s statements to Ritland with her deposition testimony in closing argument. Webb did not object at that time. He did object during the State's rebuttal after the prosecutor said E.W.'s deposition testimony "was months after [her CPC examination]. And we have no idea who [E.W.] was around, if anyone told her what to say, told her how to act."

The court sustained Webb's objection and instructed the jury to "make your decision based on the evidence as you remember it and instructions of law given to you by the court and not upon any speculation." After the case was submitted to the jury, the jurors deliberated for over two hours. After they informed the court they had reached a verdict, Webb moved for mistrial, alleging prosecutorial misconduct. The court denied the motion.

Before reaching the merits of Webb's argument, we must determine whether he preserved error. The State argues that Webb's motion for mistrial was too late to raise his prosecutorial misconduct claim. Webb counters that error was preserved because his motion was heard by the district court, responded to by the State, and ruled on before the verdict was entered.

After reviewing the record, we agree with the State and find that Webb failed to preserve error on this issue because he did not timely move for mistrial before the case was submitted to the jury. *See State v. Romeo*, 542 N.W.2d 543, 552 n.5 (Iowa 1996) ("[O]bjections to remarks of counsel during final [jury] argument are

timely if urged at close of argument and in a motion for mistrial made before submission to the jury." (quoting *State v. Nelson*, 234 N.W.2d 368, 371 (Iowa 1975))); *State v. Radeke*, 444 N.W.2d 476, 479 (Iowa 1989) (finding error was not preserved because a "request [for] a mistrial for alleged misconduct by opposing counsel must be asserted before the issues are submitted to the jury"); *see also State v. Jirak*, 491 N.W.2d 794, 796–97 (Iowa Ct. App. 1992) (explaining that "a mistrial motion must be made when the grounds therefor first become apparent.").

Webb "waived the right to appeal the trial court's ruling on his motion for mistrial by failing to raise the motion in a timely manner." *Jirak*, 491 N.W.2d at 797. So we do not reach the merits of his prosecutorial misconduct claim.

**E.    Weight of the Evidence**

Lastly, Webb argues the district court abused its discretion in denying his motion for new trial. The court may grant a new trial if the verdict is contrary to the weight of the evidence. *State v. Ellis*, 578 N.W.2d 655, 658–59 (Iowa 1998). The weight-of-the-evidence analysis involves questions of credibility: Does more credible evidence support one side than the other? "Only in the extraordinary case, where the evidence preponderates heavily against the verdict, should a district court lessen the jury's role as the primary trier of fact and invoke its power to grant a new trial." *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008).

Webb contends the State's case rested on two circumstances: that Webb and E.W. were diagnosed with gonorrhea around the same time and E.W.'s ambiguous statements to Ritland. On the other side of the scale, he argues, was the expert's concession that it was possible for gonorrhea to be transmitted non-sexually; the suggestion of alternative means of transmission; E.W.'s denial that

Webb put his hands, mouth, or tongue on her vagina; Webb's denial he touched

E.W. inappropriately; no proof Webb and E.W. had the same strain of gonorrhea;

and inconclusive evidence of when or where E.W. became infected. From these

points, he urges that the greater weight of credible evidence tipped away from the

jury's guilty verdicts.

The district court made thorough findings on the weight of the credible

evidence in denying Webb's motion for new trial. First, the court set out its findings

of the timeline of events supported by credible evidence. Next, the court found:

> Gonorrhea is classified as a sexually transmitted disease as that is its most common form of infection. It is caused by mucosal surface contact with infected bodily secretions. It is generally passed through sexual contact.
> While transference through toileting help, water bottles, sharing towels, an infected eye, or having a bath in water without soap are possible, they are not likely methods. Dr. Torson credibly explained why any of these alternative sources are unlikely, and pointed out the many problems with the old studies that mention them as possible causes of transmission. Also in Dr. Torson's lengthy experience, she has never seen a non-sexually transmitted case of gonorrhea.
> Symptoms of gonorrhea can appear after contact in as little as one day, but the most common time frame is two to five days, and if symptoms are going to develop, they generally occur within two weeks. A person need not be symptomatic in order to pass the disease.
> While cross-examination by [Webb] provided grounds for the fact finder to determine not to give weight to Torson's evidence, there was not otherwise direct evidence contradicting her, and the Court found her testimony to be credible.

The court then explained:

> The weight of the credible evidence is the following chain of circumstantial evidence, which is as probative as direct evidence. Webb had gonorrhea in his mouth and rectum. The most likely source of E.W.'s gonorrhea in her vaginal area was from sexual contact, mouth to genital contact is a sex act and is the type of mucosal surface to mucosal surface contact that is the most likely form of spread, and non-sexual modes of transmission are very

unlikely. E.W.'s symptoms developed in the time frame that is most consistent with her being infected in the State of Iowa shortly before the family trip to Nebraska, during which time Webb had opportunity to be alone with her.

The court also considered portions of E.W.'s deposition testimony played for the jury, noting her answers were often inconsistent and unclear. The court then addressed the possible alternative means of transmission Webb raised:

> The defense emphasized evidence that would explain that E.W. got gonorrhea when sharing a bath in Nebraska with her father as the likely explanation. However, the one point E.W. was adamant and consistent on in her deposition was that she had never had a bath with her father. In addition, her brother would have been in the bath as well and he never got gonorrhea.

After explaining all these findings, the court denied Webb's motion for new trial, concluding:

> The Court finds this chain of evidence firmly convinced the fact finder that [Webb] was guilty of the offenses, and the Court specifically finds that the weight of . . . credible evidence supports the verdict rendered. It does not preponderate heavily against it, such that it would be a miscarriage of justice to leave the verdict that was rendered intact. The Court does not find in the record reason to believe that critical evidence was ignored in the fact-finding process by the jury.

When faced with Webb's weight-of-the-evidence challenge, the question for the district court was not whether enough credible evidence supported the jury's verdicts or alternative verdicts, but whether the "greater amount of credible evidence" suggested the jury's verdicts were a miscarriage of justice. *State v. Jackson Thomas*, 987 N.W.2d 455, 464 (Iowa Ct. App. 2022) (citation omitted). Given the strong circumstantial evidence in the record, the court did not abuse its discretion in denying Webb's motion for new trial.

**AFFIRMED.**