# IN THE SUPREME COURT OF IOWA

No. 11–1262

Filed January 25, 2013

**STATE OF IOWA,**

    Appellee,

vs.

**KAREN SUE HUSTON,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Lee (North) County, John G. Linn, Judge.

Defendant appeals the judgment and sentence following her conviction for child endangerment causing serious injury. **COURT OF APPEALS DECISION AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AND SENTENCE REVERSED, AND CASE REMANDED FOR NEW TRIAL.**

Mark C. Smith, State Appellate Defender, Samuel S. Berbano, Student Legal Intern, and Shellie L. Knipfer, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, Michael P. Short, County Attorney, and Clinton R. Boddicker, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

Defendant, Karen Sue Huston, was one of several adult caregivers for a five-year-old girl suffering from malnutrition. This appeal presents the question whether the district court committed reversible error in Huston's criminal jury trial by allowing a caseworker for the Iowa Department of Human Services (DHS) to testify that a child abuse report against Huston was administratively determined to be "founded." Huston objected to this testimony as irrelevant and unfairly prejudicial.

The jury found Huston guilty of child endangerment causing serious injury. The district court sentenced Huston to a term of fifteen years in prison. Huston appealed, contending the evidence was insufficient to prove a "serious injury" and that the district court erred by allowing testimony on the DHS administrative finding. The court of appeals affirmed, and we granted Huston's application for further review.

We exercise our discretion to limit our review to the evidentiary ruling on the founded child abuse report. *See State v. Marin*, 788 N.W.2d 833, 836 (Iowa 2010). Division III of the court of appeals decision shall stand as the final opinion in this appeal on the sufficiency of the evidence to support Huston's conviction. For the reasons explained below, we hold it was reversible error to allow testimony that DHS had determined the child abuse complaint against Huston was founded. Accordingly, we vacate Division II of the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.

## I. Background Facts and Proceedings.

The victim, T.H., was born in January 2005 to Brandon Holmes and Christie Polhans. Brandon is now married to Mandy Holmes, who has four children. Mandy is the daughter of Karen and Fred Huston.[1]

In November 2008, T.H. began living with Brandon and his wife, Mandy, in Fort Madison, Iowa, after DHS removed T.H. from the care of her mother. Approximately one month later, Brandon, Mandy, T.H., and Mandy's four children moved into the Hustons' two-bedroom home, where they all stayed until April or May 2010. Mandy was T.H.'s primary caregiver during this time. In April of that year, shortly before Brandon and Mandy moved out, Huston returned home from serving a ten-month federal prison sentence in Texas for passing money orders in violation of 18 U.S.C. § 500.

Although Karen and Fred initially denied that T.H. lived with them, Huston admitted at trial that when Brandon and Mandy moved out T.H. remained at the Hustons' home. During this eight-month period, Karen, Fred, and Mandy were all involved in caring for T.H. Fred would occasionally make breakfast or dinner for T.H., but was otherwise gone most of the day. Mandy would come over daily and sometimes would prepare T.H.'s breakfast or lunch. Mandy was also the one who would bathe T.H.

Huston is disabled and confined to a wheelchair. She weighs 395 pounds, and her right hip socket is "broke off." She suffers from COPD and asthma. She is unable to climb stairs and, for that reason, sleeps on a bed in the dining room. In light of her limited mobility, Huston could only prepare sandwiches and other quick meals for T.H.

---

[1]References to "Huston" throughout this opinion are to Karen Huston.

Dr. Frank Artinian, T.H.'s pediatrician, first became concerned about T.H.'s weight in November 2009. T.H. had lost approximately five pounds or twelve percent of her body weight since her last doctor's visit in May. Dr. Artinian tested T.H. for various medical conditions that could be at the root of her failure to thrive, but all the tests came back negative. Dr. Artinian wished to have T.H. admitted to the hospital at that time for further testing and evaluation, but Mandy lacked authority to consent to T.H.'s hospitalization, and DHS declined to force T.H.'s hospitalization. In lieu of hospitalization, Mandy brought T.H. in for weekly weight checks for the next month. T.H.'s weight remained stable during this time period.

Dr. Artinian did not see T.H. again until ten months later when Mandy brought T.H. in at the request of DHS. DHS caseworker, Sharon Andrusyk, had received a report that T.H. was not wearing the glasses prescribed for her to correct her crossed eyes. Andrusyk contacted Mandy, and she brought T.H. into the DHS office a day later on October 20, 2010. During this meeting, Andrusyk immediately noticed that something was wrong with T.H. Andrusyk noted that T.H.'s skin was "pale and gray," her affect was flat, and the hair on the top of her head was extremely thin. Andrusyk asked Mandy to take T.H. to see a doctor.

Mandy took T.H. in to see Dr. Artinian. Dr. Artinian determined T.H. was failing to thrive. Failure to thrive is not a diagnosis but, rather, "a description of what's going on with a child." There are numerous potential causes for failure to thrive. Dr. Artinian described T.H.'s failure to thrive as "very serious" and noted that he "was actually worried about her life at that point in time" because T.H. had not gained any weight in

nearly a year. Dr. Artinian was unable to identify an illness or disease that could account for T.H.'s condition.

After examining T.H., Dr. Artinian wrote Andrusyk a letter expressing his concerns regarding T.H.'s condition. Dr. Artinian wrote: "[T.H.] had not grown or gained any weight in 10 months. Her hair is thinning, she is emaciated and has a wasted appearance. [T.H.]'s skin is dry and loose. Her affect is flat." Dr. Artinian told Mandy that he was "profoundly concerned about [T.H.]'s medical and psychological health." Nevertheless, Mandy remained unconcerned. Dr. Artinian, therefore, urged DHS to compel T.H.'s hospitalization. He noted: "As a pediatrician, I have grave concerns regarding the physical and mental health of [T.H.]. I am very concerned that she is undergoing abuse/neglect in her home. DHS absolutely needs to take action to help this child."

After receiving Dr. Artinian's letter, Andrusyk obtained authorization to remove T.H. from the Hustons' home, to admit her to the hospital, and to place her in foster care thereafter. On November 2, Andrusyk went to Brandon and Mandy's home to remove T.H., but she was not there. Brandon told Andrusyk that T.H. was with Mandy at an appointment, but refused to tell Andrusyk where they were. Eventually, Andrusyk found Mandy, but T.H. was not with her. Mandy took Andrusyk to the Hustons' home and went inside the home and removed T.H. Andrusyk noted the following about T.H.'s condition that day:

> She was very dirty. Her clothing was dirty. Her hair was matted. She, again, would not make eye contact, would not talk, except to repeat some things. She did state she was hungry. Her skin was very gray and loose appearing, again, very flat affect. She just didn't talk hardly.

Andrusyk took T.H. to the hospital, where she was admitted by Dr. Christopher Youngman. T.H. stayed in the hospital for five days.

Andrusyk returned to the hospital the day after T.H. was admitted and took photographs of T.H, including some bruising that appeared after she was rehydrated. Andrusyk noted T.H.'s skin tone and affect had improved markedly since her admission to the hospital the previous day.

During T.H.'s hospitalization, Dr. Artinian and Dr. Youngman ruled out a number of medical causes for T.H.'s failure to thrive. While in the hospital, T.H. ate everything presented to her and sometimes asked for more to eat. On the last day of her hospitalization, T.H. ate a lot of food and vomited. By the time T.H. was released from the hospital, she had gained nine pounds.

Dr. Artinian testified it was his opinion, to a reasonable degree of medical certainty, that

> the reason why [T.H.] was failing to grow properly and gain weight over time was that she was not receiving an adequate amount of calories, meaning she was not getting enough food. This was—this was determined by ruling out the other problems that could cause it, but more than that, by hospitalizing her for five days, we were able to control her environment and control her caloric intake, and when given calories, she gained weight. We did no other intervention for her. We gave her no other medicine or therapies that would cause weight gain, and during that five days, [T.H.] came into the hospital at 34 pounds and was discharged at 43 pounds, which is a nine pound weight gain in five days, which is—just speaks to the fact that when given calories, she was able to grow.

Dr. Youngman similarly concluded, to a reasonable degree of medical certainty, that the cause of T.H.'s failure to thrive was "inadequate caloric intake . . . she just was not receiving enough calories to grow." Dr. Youngman also noted that if left untreated, "people can die of malnutrition," and even short of death, they can suffer "[n]eurological consequences . . . and other organ damage as well."

After T.H.'s release from the hospital, she was placed in foster care. Apart from another episode of vomiting, T.H. has thrived in her new environment. T.H. has continued to gain weight since her release from the hospital and, as of her last appointment, was between the 50 and 75 percentiles on the growth chart for weight. In addition to these improvements, the hair on the top of T.H.'s head has filled in, and she has grown two inches.

Leslie Boyer, a caseworker with DHS, was assigned to investigate the allegations brought against Karen and Fred regarding T.H.'s care. Boyer interviewed Karen and Fred at their home as part of this investigation. During both interviews, Karen and Fred denied that T.H. was living with them at the time DHS intervened. They later admitted at trial that, after Brandon and Mandy moved from their home, T.H. stayed behind with them.

During these interviews, Huston also reported that she had seen T.H. overeat and vomit several times. At trial, Fred and Mandy testified to similar behavior. Huston also told Boyer that T.H. would eat more than any of the other children and that she believed T.H. had an eating disorder. Moreover, Huston and Mandy testified that they thought T.H.'s failure to thrive may have resulted from the stress she experienced when Brandon cut ties with his own mother and prevented T.H. from seeing her siblings and maternal grandparents.

On December 27, 2010, the State charged Karen and Fred each with two counts of child endangerment. Count I alleged they knowingly acted in a manner creating a substantial risk to T.H. or willfully depriving T.H. of food, causing serious injury in violation of Iowa Code sections 726.6(1)(a), 726.6(1)(d), and 726.6(5) (2009). Count II alleged Karen and Fred intentionally used unreasonable force, torture, or cruelty

on T.H. causing bodily injury in violation of Iowa Code sections 726.6(1)(*b*) and 726.6(6). The cases against Karen and Fred were consolidated for trial.

The three-day trial began on June 20, 2011. Nine witnesses testified, including Karen and Fred, who were the defendants' only witnesses. One of the State's witnesses, DHS caseworker Boyer, testified regarding her investigation of the child abuse allegations against Karen and Fred and her conclusions following that investigation. Boyer and the county attorney had the following exchange:

> Q. As a result of your investigation, were you, as part of your work, able to reach a conclusion—you talked earlier about founded, not confirmed, so forth. Did you reach a conclusion with respect to that? A. Yes.
>
> . . . .
>
> Q. And what was your conclusion?
>
> MR. DIAL: Objection. Relevancy and lower burden of proof, Your Honor.
>
> MR. ORT: Same objection.
>
> THE COURT: Overruled. You may answer.
>
> [BOYER]: My outcome of my report was a founded child abuse report, two separate, actually, reports: One on Karen Huston and one on Fred Huston. It was founded on denial of critical care, failure to provide adequate supervision, also on physical abuse, and failure to provide adequate food.

Boyer had previously testified that a report would be founded if there was a preponderance of evidence. The county attorney then asked Boyer whether there was a process for appealing a founded child abuse report. The court, over defense counsel's objection, permitted Boyer to explain the appeal process. The county attorney next asked Boyer whether either Karen or Fred had appealed the founded reports against them. Before Boyer was allowed to answer, the court sustained the objections of defense counsel.

At the close of the State's case, defense counsel for Karen and Fred moved for a judgment of acquittal on both counts. The court granted the motions for both defendants as to count II, but denied the motions as to count I.

At the close of the defendants' case, the court denied defendants' renewed motions for judgment of acquittal on count I. The court submitted the case to the jury. The jury found Huston guilty on the felony charge of child endangerment causing serious injury. Fred was found guilty of a lesser included misdemeanor—child endangerment causing no injury, in violation of Iowa Code sections 726.6(1) and 726.6(7). Huston admitted she had at least two prior felonies, making her a habitual offender eligible for an enhanced sentence under Iowa Code sections 902.8 and 902.9(3). The court denied the defendants' motions for a new trial on August 5. The court sentenced Huston to a term not to exceed fifteen years.

Huston appealed, alleging the district court erred in admitting DHS caseworker Boyer's testimony that the child abuse report against Huston was founded and describing the process for appealing an administrative finding of child abuse. Huston also contends her trial counsel was ineffective when he failed to move for judgment of acquittal after the State failed to prove T.H. suffered serious injury. Fred did not appeal the judgment or sentence entered against him. We transferred the case to the court of appeals.

A three-judge panel of the court of appeals affirmed Huston's conviction and sentence for child endangerment causing serious injury. The court of appeals concluded the district court acted within its discretion by admitting Boyer's testimony as relevant:

Boyer's testimony regarding the report described T.H.'s weight loss, failure to grow, and poor condition—evidence consistent with intentional abuse or neglect, an essential element the State needed to prove. The testimony explained the investigatory and protective steps taken by DHS to determine whether evidence supported the initial information DHS received, and how the investigation resulted in a "founded" report. The testimony explained why further action was taken against Huston and what measures were taken to protect T.H.

The court of appeals further held Boyer's testimony was not unfairly prejudicial:

[T]he probative value of the evidence outweighed any danger of unfair prejudice to Huston [because] . . . [u]nder these facts, evidence of a founded child abuse report is hardly the type of information that would arouse horror or surprise in the jury or lure the jury into declaring guilt on a ground different from proof specific to the offense charged.

The court of appeals also found that any error in admitting Boyer's testimony was harmless.

We granted Huston's application for further review.

## II. Scope of Review.

We review evidentiary rulings for abuse of discretion. *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001); *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000) ("We reverse a ruling that the district court makes in the balancing process under rule 403 only if the district court has abused its discretion.").

## III. Analysis.

We must decide whether the district court committed reversible error by allowing the DHS caseworker to testify that the child abuse report against Huston was determined to be founded. Huston argues "the danger here was that the jury would find [her] guilty because DHS found her to have committed child abuse." The State contends testimony that the abuse report was deemed founded was admissible to explain the

actions taken by DHS to remove T.H. from Huston's care and that any error in admitting this testimony was harmless.

We recognize that a DHS caseworker may need to provide some context when she testifies in a child endangerment case as to her personal observations of the victim or home environment and when she recounts the statements made by the defendant during interviews. But, we have also cautioned " 'the line of inadmissibility' " may be crossed when an investigator's testimony goes " 'beyond the point of merely explaining why certain responsive actions were taken.' " *State v. Elliot*, 806 N.W.2d 660, 668 (Iowa 2011) (quoting *State v. Doughty*, 359 N.W.2d 439, 442 (Iowa 1984)). Here, T.H.'s removal for hospitalization and the interviews of Karen and Fred Huston all occurred before the DHS's determination that the child abuse allegations were founded. Boyer could have simply testified that she acted in response to a report of child abuse to provide the context necessary for this testimony, without telling the jury that DHS determined the abuse report to be founded.

Huston argues any probative value of the fact DHS deemed the abuse report against Huston to be founded was substantially outweighed by the danger of unfair prejudice. We agree. Even relevant evidence is inadmissible " 'if its probative value is substantially outweighed by the danger of unfair prejudice.' " *McClure,* 613 N.W.2d at 235 (quoting Iowa R. Evid. 5.403). Rule 5.403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We employ a two-part test to decide whether evidence should be excluded under rule 5.403. *See State v. Cromer*, 765 N.W.2d 1, 8 (Iowa 2009).

First, we "consider the probative value of the evidence." *Id.* Second, we balance the probative value " 'against the danger of its prejudicial or wrongful effect upon the triers of fact.' " *Id.* (quoting *State v. Harmon,* 238 N.W.2d 139, 145 (Iowa 1976)).

"[T]he purpose of all evidence is to sway the fact finder." *State v. Mitchell,* 633 N.W.2d 295, 301 (Iowa 2001) (Neuman, J., dissenting). In child abuse cases, much evidence will be "at least somewhat prejudicial. Exclusion is required only when evidence is *unfairly* prejudicial [in a way that] substantially outweighs its probative value." *Id.* " 'Unfair prejudice' is the ' "undue tendency to suggest decisions on an improper basis, commonly though not necessarily, an emotional one." ' " *McClure,* 613 N.W.2d at 235 (quoting *State v. Plaster,* 424 N.W.2d 226, 231 (Iowa 1988)).

We see no probative value to the DHS determination the abuse report against Huston was founded. Whether or not the abuse report was deemed founded is irrelevant to any issue for the jury to decide. Additionally, we see a real danger the jury will be unfairly influenced by that agency finding, which gives the "imprimatur" of a purportedly unbiased state agency on a conclusion that Huston was guilty of child abuse. A federal court recently applied the same balancing test under Federal Rule of Evidence 403 to exclude from evidence a fire department report on the cause of a fire. *EMK, Inc. v. Fed. Pac. Elec. Co.,* 677 F. Supp. 2d 334, 338 (D. Me. 2010). The court concluded,

> Because . . . the report . . . carries the imprimatur of municipal government, the jury could well place undue emphasis on its summary causation conclusion on the assumption that it reflects the considered opinion of a fire investigator, who is cloaked with governmental objectivity and expertise.

*Id.* We see the same danger here.

Other courts have recognized the danger a jury will be unfairly influenced by an administrative agency finding. In *Rambus, Inc. v. Infineon Technologies, AG*, 222 F.R.D. 101, 110 (E.D. Va. 2004), the court held that Rule 403 required exclusion of a decision by an administrative law judge. The court surveyed the authorities as follows:

> First, the jury, when confronted with the Initial Decision, likely would give undue weight to the findings of the ALJ. *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) (upholding trial court's decision under Fed. R. Evid. 403 to exclude report of state agency because "jury would have placed undue weight on such evidence") (internal citations and quotations omitted); *accord Williams v. Nashville Network,* 132 F.3d 1123, 1129 (6th Cir. 1997) ("A strong argument can made that a jury would attach undue weight to this . . . agency determination."). Similarly, the jurors' ability to reach their own determinations respecting the facts at issue in this case would be undermined by the admission of the Initial Decision. *United States v. MacDonald,* 688 F.2d 224, 230 (4th Cir. 1982) (upholding trial court's decision under Fed. R. Evid. 403 to exclude executive branch investigator's findings and conclusions because report "tend[ed] to undermine the exclusive province of the jury"); *see also* Steven P. Grossman & Stephen J. Shapiro, *The Admission of Government Fact Findings Under Federal Rule of Evidence 803(8)(C): Limiting the Dangers of Unreliable Hearsay,* 38 U. Kan. L. Rev. 767, 778–779 (1990) ("Jurors learning that a presumably objective public official has reached a certain conclusion after hearing evidence similar to what they have heard may have difficulty reaching an opposite conclusion. Further, the jury is likely to deliberate on the correctness of the previous fact finding, rather than retaining the open-minded, first impression approach to the issues our system prefers.").

*Rambus, Inc.*, 222 F.R.D. at 110.

Other courts have applied the Rule 403 balancing test to exclude evidence of administrative agency determinations in employment discrimination cases. One such court pointedly observed, "presenting the administrative *findings* with respect to plaintiff's charge of discrimination is 'tantamount to saying "this has already been decided and here is the decision." ' " *Brom v. Bozell, Jacobs, Kenyon & Eckhardt,*

*Inc.*, 867 F. Supp. 686, 692 (N.D. Ill. 1994) (quoting *Tulloss v. Near N. Montessori Sch., Inc.*, 776 F.2d 150, 154 (7th Cir. 1985)).  The Eighth Circuit affirmed the trial court's ruling to exclude from evidence in a jury trial the EEOC's administrative determination of racial discrimination. *Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304, 1309–10 (8th Cir. 1984).  The *Johnson* court observed that to allow the agency finding into evidence

> would amount to admitting the opinion of an expert witness as to what conclusions the jury should draw, even though the jury had the opportunity and the ability to draw its own conclusions from the evidence presented regarding disparate treatment.

*Id.* at 1309; *see also Jones v. Cargill, Inc.*, 490 F. Supp. 2d 989, 992–93 (N.D. Iowa 2007) (excluding evidence of finding by Cedar Rapids Civil Rights Commission of no probable cause as to race discrimination).

These cases are persuasive.  Telling the jury the DHS determined the child abuse complaint against Huston was founded was unfairly prejudicial due to the risk the jury would substitute the DHS determination for its own finding of guilt or would give the determination undue weight.

The State argues the risk of prejudice was mitigated by testimony from the DHS caseworker as to the lower burden of proof to establish a child abuse complaint as founded by the agency.  The district court gave no curative or limiting instruction to the jury regarding the DHS determination.  Other courts have allowed testimony as to administrative findings with a curative or limiting instruction.  *See, e.g.*, *United States v. W.R. Grace*, 455 F. Supp. 2d 1203, 1207 (D. Mont. 2006) (allowing evidence of EPA environmental risk assessment because the jury is capable of "[d]ifferentiating between the different standards" with the

help of a limiting jury instruction); *Commonwealth v. Hernandez*, 615 A.2d 1337, 1341 (Pa. Super. Ct. 1992) (affirming conviction for sexual abuse of minor when trial court gave cautionary instruction "that only the jury was the factfinder . . . and [that] it 'must not and may not accept any standard adopted by DHS' "). We do not believe it would have been proper in this case to allow testimony that the child abuse report was determined to be founded even with a limiting instruction. In any event, we conclude Boyer's testimony as to the lower burden of proof was insufficient to cure the unfair prejudice.

The risk of unfair prejudice to Huston was exacerbated by further testimony as to the right to appeal the DHS determination, followed by the district court's evidentiary ruling preventing testimony as to whether Huston appealed. The jury could improperly infer Huston's guilt from the absence of a successful appeal overturning the DHS finding that the child abuse complaint against her was founded.

For all these reasons, we hold the district court abused its discretion by allowing the jury to hear testimony the child abuse complaint against Huston was founded. Nor are we persuaded the error was harmless. Prejudice is presumed, and the State bears the burden of showing lack of prejudice. *State v. Howard,* ___N.W.2d ___, ___ (Iowa 2012). The evidence against Huston was strong, but not overwhelming. Huston shared responsibility for feeding T.H. with several other caregivers. Huston's own mobility was limited. The child–victim had problems vomiting in the hospital and with her new foster parents. The seriousness of the child's injury from malnutrition and Huston's intent and role in the victim's endangerment were disputed issues. We cannot conclude the record affirmatively establishes that Huston was not

prejudiced by the erroneous admission of evidence that the child abuse complaint against her was founded. She is entitled to a new trial.

**IV. Conclusion.**

We hold the district court abused its discretion by allowing the DHS caseworker to testify the child abuse report against Huston was founded. That evidentiary error was not harmless, and accordingly, Huston is entitled to a new trial. We therefore vacate Division II of the court of appeals decision and reverse the judgment and sentence of the district court. We remand the case for a new trial.

**COURT OF APPEALS DECISION AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AND SENTENCE REVERSED, AND CASE REMANDED FOR NEW TRIAL.**