# IN THE COURT OF APPEALS OF IOWA

No. 22-1543
Filed October 2, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DANIEL FLETCHER JACKSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Jeanie Vaudt, Judge.


A defendant appeals his convictions for murder, robbery, and burglary.

**AFFIRMED.**


Jamie L. Hunter of Dickey, Campbell & Sahag Law Firm, Des Moines, and

Nathan A. Mundy (until withdrawal) of Mundy Law Office, P.C., Des Moines, for

appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.


Heard by Tabor, C.J., and Chicchelly and Sandy, JJ.

**TABOR, Chief Judge.**

Daniel Jackson appeals his convictions for murder, robbery, and burglary, all in the first degree. He contends the State offered insufficient evidence to support the jury verdicts and the district court abused its discretion in evidentiary rulings. Viewing the evidence in the light most favorable to the verdicts, we find substantial evidence of guilt on all three counts. As for the evidence claims, the court properly exercised its discretion in allowing the jury to see body camera footage from a police officer depicting the victim near death, as well as a Snapchat video of Jackson holding a pellet gun. So, we affirm.

## I.    Facts and Prior Proceedings

Best friends since high school, Zachary Hartman and Caleb Smith lived in a house together on Searle Street in Des Moines. Hartman and Smith often let other friends "crash there" when they didn't have anywhere to stay. Their houseguests included Jackson and his brother Donovan.[1] But in October 2021, Hartman and Smith grew tired of the Jackson brothers breaking "house rules" and asked them to leave.

About ten days after that falling out, a warrant team from the sheriff's office stopped by Searle Street, inquiring into Donovan's whereabouts. Hartman told them where they could find his former houseguest. Shortly after sharing that information with law enforcement, Hartman received a Snapchat message from Cayden McCormick, a friend he met through Donovan. McCormick warned

---

[1] We refer to Daniel with his surname and Donovan with his first name.

Hartman and Smith to watch their backs because they had "bad things coming" their way.

On October 27, another regular overnight guest, Cory Elifritz, stayed at the Searle Street house. Hartman and Smith had night shifts at the warehouse where they worked. Hartman left for work around 12:50 a.m., and Smith's shift ended at 1:00 a.m. Alone at their house was Elifritz, asleep in Smith's bed.

That same day, Jackson was hanging out with Taylor Austin and Tyrone Davis. In the early evening, Jackson and Davis asked if Austin wanted to make some money. He agreed, and Davis drove them around in his car until dark. Jackson directed them to the Searle Street house.

According to Davis, Jackson planned to rob this house "[b]ecause the two people who live there gave up his brother, and that's how he got arrested." To carry out his plan, Jackson entered the house. But the threesome soon left because there were still residents inside. As they were leaving, Jackson handed Davis a wallet containing Hartman's driver's license and other cards.

After killing some time at a gas station, Jackson, Austin, and Davis returned to the Searle Street house. They entered through the back door. Austin and Davis started unplugging gaming consoles in the living room and placing them in a backpack. Leaving his accomplices to the thefts, Jackson went down the hallway toward the bedrooms. Then, Austin and Davis heard a noise from that direction.[2]

---

[2] Austin testified it was a scream of "bloody murder." Davis testified it was a "muffled scream."

Davis ran into the bedroom and "saw a shadowlike figure just doing a plunger-type motion on the bed."[3] Then he saw a flash of headlights from outside illuminating "blood everywhere all over the bed." Davis said he was armed with a pellet gun, "freaked out," and fired. He recalled shooting "four times at the kid's face." After that, Davis, Jackson, and Austin ran to the car. Davis drove them to a parking lot where they changed clothes. Austin testified that Davis and Jackson threw their bloody clothes into "a nearby brush of trees."[4]

When Smith returned home from work in the early hours of October 28, he noticed the back door was not fully latched; the front door was open. He found the bedroom "covered in blood" and Elifritz "bleeding very, very badly" and "rolling around on the bed." There was a knife blade and the blade handle on the bed, which Smith recognized as coming from his kitchen. He called 911.

Des Moines Police Officer Ernesto Escobar responded to the call. His body camera recorded his entry into the house, where Smith led him to the bedroom. Elifritz was on the floor at the foot of the bed, covered in blood. When medics arrived, they administered first aid, but Elifritz died.

Meanwhile, Jackson, Davis, and Austin slept in the downtown skywalk that night. The next day, they went to Davis's sister's house, where police arrested them.[5] Des Moines Police Sergeant Jason Hays testified that the investigation first led them to McCormick, based on the threatening Snapchat message, but they

---

[3] Davis demonstrated the motion for the jury. The prosecutor later summarized that motion as "two hands clenched together in a downward movement."
[4] On cross-examination, Austin admitted he was drunk that whole day and conceded his memory was impaired because of the alcohol.
[5] At first, neither Austin nor Davis told police the truth. Austin testified he did not want to be beat up in prison for being a "rat."

determined he was not involved. Still, in jail calls to McCormick, Donovan said his brother was "at the house to retrieve some property." When arrested, the three accomplices had Hartman's wallet and identification cards. Police also recovered the backpack with the gaming consoles.

When discussing the attack on Elifritz, crime scene investigator Cody Brigman said he was operating under the impression that only a bladed weapon was used in the crime. So, investigators did not look for the pellets that Davis said he shot. Likewise, the Polk County Medical Examiner documented thirty-nine "sharp-force injuries" on Elifritz's body and determined the cause of death was blood loss but found no injuries consistent with a pellet gun.

In fact, no forensic evidence linked Jackson or his companions to the stabbing. Investigators did not search for blood in Davis's car, nor did they test blood found at the house for DNA. And Jackson was not examined for injuries.

The State charged Jackson with murder in the first degree,[6] robbery in the first degree,[7] and burglary in the first degree.[8] Austin and Davis testified for the State. The court admitted Escobar's body camera recording and a Snapchat video depicting Jackson with a pellet gun over Jackson's objections. The jury found Jackson guilty of the three offenses, and he appeals.

---

[6] A class "A" felony in violation of Iowa Code sections 707.1 and 707.2 (2021).
[7] A class "B" felony in violation of Iowa Code sections 711.1 and 711.2.
[8] A class "C" felony in violation of Iowa Code sections 713.1 and 713.3.

## II. Discussion

### A. Sufficiency of the Evidence for Three Convictions

Jackson contends the verdicts were not supported by sufficient evidence. We review his claims for correction of legal error. *See State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider the proof "in the light most favorable to the State," allowing for all reasonable inferences it will support. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (citation omitted). If a rational jury could find guilt beyond a reasonable doubt, we affirm. *Id.* While we consider all the evidence—exculpatory and inculpatory alike—we are mindful that the jury is "free to reject certain evidence, and credit other evidence." *Id.* (citation omitted).

To prove murder in the first degree, the State had to show:

> 1. . . . [Jackson] or someone he aided and abetted stabbed Cory Elifritz.
> 2. Cory Elifritz died as a result of being stabbed.
> 3. [Jackson] or someone he aided and abetted acted with malice aforethought.
> 4. (a) [Jackson] or someone he aided and abetted acted willfully, deliberately, premeditatedly and with a specific intent to kill Cory Elifritz or another;
> or
> (b) [Jackson] or someone he aided and abetted was participating in the crime of burglary . . . .

The jury was told "'specific intent' means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind." Because specific intent is hard to prove directly, the jury was instructed to "consider the facts and circumstances surrounding the act to determine [Jackson's] specific intent" and could "conclude [Jackson] intend[ed] the natural result of his acts."[9]

---

[9] The jury was also instructed on transferred intent:

Jackson argues that if a "revenge plot" existed, the targets were Smith and Hartman—not Elifritz, whom he didn't know. Jackson contends he harbored no malice toward Elifritz and did not plan to attack him. He also asserts that no one saw him with a knife.

While Jackson's points may be true, they do not undermine the first-degree murder verdict. On the evidence presented, the jury could reasonably find each element beyond a reasonable doubt. Davis testified he saw a "shadowlike figure . . . doing a plunger-type motion on the bed" where Elifritz was found covered in blood. Because Davis saw Jackson head toward the bedroom, the jury could reasonably infer that he was the "shadowlike figure" on the bed.

To counter that inference, Jackson attacks the credibility of the State's witnesses—pointing out that Davis and Austin testified he was motivated by revenge but purported to receive no benefit themselves from turning against him. He calls them "unreliable co-conspirators" and decries the dearth of corroborating physical evidence connecting him to the crime. But sorting whether Davis and Austin could be believed was for the jury to determine. *See State v. Brown*, 996 N.W.2d 691, 696 (Iowa 2023). As was weighing the lack of forensic evidence. *Id.*

As for malice, the court provided this definition: "a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred,

---

Under the doctrine of "transferred intent," once the intent to inflict harm on one victim is established, the criminal intent transfers to any other victim who is actually assaulted. A party is liable for a wrongful act, where there exists a criminal intent, although the act done is not that which was intended. The wrongful intent to do one act, is transposed to the other, and constitutes the same offense. But in oral argument, the State clarified that it did not rely on transferred intent to make its case.

or with an evil or unlawful purpose." The State may show malice with evidence of "actual hatred" but also "by proof of a deliberate or fixed intent to do injury." Here, the jury could find malice from Jackson's conduct—stabbing the victim more than three dozen times. The State did not need to show Jackson devised a plan to kill Elifritz before the home invasion. As the jury was instructed: "Malice requires only such deliberation as would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion."

In that same vein, malice aforethought need not exist for any given length of time. A jury instruction explained that it is "a fixed purpose or design to do some physical harm to another which exists before the act is committed." So, a lack of animosity toward Elifritz before that night did not prevent the jury from concluding Jackson acted with malice aforethought. The murder weapon was a knife from Hartman's kitchen, which Jackson passed through to get to the bedroom. It was reasonable for the jury to infer that Jackson picked up the knife with the intent to commit a wrongful act. The jury could also infer that Jackson acted with malice aforethought as he inflicted nearly forty stab wounds, including an incision deep enough to penetrate the victim's heart, as the medical examiner testified.

Another key instruction allowed the jury to infer malice, premeditation, and specific intent to kill from Jackson's use of a dangerous weapon. The jury instructions explained a dangerous weapon is one that is "used in such a way as to indicate the user intended to inflict death or serious injury and when so used is capable of inflicting death." *See* Iowa Code § 702.7 (explaining "any instrument or device of any sort whatsoever which is actually used in such a manner as to

indicate that the defendant intends to inflict death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being, is a dangerous weapon). That is how Jackson wielded the knife against Elifritz. *See State v. Serrano*, No. 21-1624, 2022 WL 10802513, at *3 (Iowa Ct. App. Oct. 19, 2022). Thus, the State offered substantial evidence to prove premeditated murder.

In the alternative, the jury could have found Jackson committed murder in the first degree from his participation in the felony of first-degree burglary, which we will discuss after his robbery challenge.

To convict Jackson of robbery in the first degree, the State had to prove:

> 1. . . . [Jackson] or someone he aided and abetted had the specific intent to commit a theft.
> 2. To carry out that intention or to assist him or someone he aided and abetted in escaping from the scene, with or without stolen property, [Jackson] or someone he aided and abetted committed an assault[10] on Cory Elifritz.
> 3. [Jackson] or someone he aided and abetted purposely inflicted or attempted to inflict a serious injury on Cory Elifritz or was armed with a dangerous weapon.

Jackson contends the State didn't show he felt vengeful toward or had the specific intent to injure Elifritz. But the offense of robbery only required the State to show Jackson had a specific intent to commit a theft. The jury could reasonably conclude Jackson had that intent when he enlisted Davis and Austin to help him take items from the house, including the gaming consoles and Hartman's wallet. The jury could also conclude Jackson assaulted Elifritz, for the same reasons we

---

[10] The court instructed the jury that an assault occurs when a person does an act which is intended to cause pain or injury, result in insulting or offensive physical contact, or place the victim in fear of immediate physical contact that would be painful, injurious, insulting, or offensive; and the assailant has the apparent ability to commit that act.

affirm the murder verdict. And the jury could reasonably conclude Jackson was armed with a dangerous weapon, the knife, proving the final element of robbery.

To prove its burglary charge, the State had to show Jackson entered the Searle Street house "with the specific intent to commit a theft, an assault, or a felony." Jackson contests only the specific-intent element. But we have already decided that the jury could reasonably conclude he had the specific intent to commit a theft. So substantial evidence supported the burglary verdict too.

Because the State presented ample proof for the challenged elements of the crimes, we affirm Jackson's convictions for murder, robbery, and burglary.

## B. Evidentiary Challenges

Jackson also disputes two evidentiary rulings. First, he contends the court improperly allowed the jury to see Officer Escobar's body camera footage of Elifritz on the floor—still alive but bleeding to death. Second, Jackson claims the court should have excluded the Snapchat video showing him holding a pellet gun.

We review these evidentiary rulings for an abuse of discretion. *See State v. Amisi*, 997 N.W.2d 683, 688 (Iowa 2023). A district court abuses its discretion when it bases the ruling on untenable grounds or relies on a faulty application of the law. *State v. Lacey*, 968 N.W.2d 792, 805–06 (Iowa 2021). But even if the district court abused its discretion, we will not reverse if the error was harmless. *State v. Henderson*, 696 N.W.2d 5, 10 (Iowa 2005); Iowa R. Evid. 5.103(a) (a party may claim evidentiary error "only if the error affects a substantial right").

### 1. Body camera video of Elifritz's death

At trial, Jackson objected to the body camera video as irrelevant and unfairly prejudicial. He reprises those arguments on appeal.

We begin with the core rule that relevant evidence is admissible, while irrelevant evidence is not. Iowa R. Evid. 5.402. Evidence is relevant if "[i]t has any tendency to make a fact more or less probable than it would be without the evidence; and . . . [t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. "Whether the necessary minimum level of logical connection between the offered evidence and the fact to be proven exists is a legal question lying within the broad discretion of the trial court." *State v. Thompson*, 954 N.W.2d 402, 407 (Iowa 2021) (quoting *State v. Tracy*, 482 N.W.2d 675, 680–81 (Iowa 1992)). And courts recognize relevance as "a relatively low bar." *State v. Thoren*, 970 N.W.2d 611, 622 (Iowa 2022) (citation omitted).

Before trial, the State argued the video was relevant to show the interior of the house and the victim's condition. The defense countered that other evidence would show the crime scene and establish that Elifritz died by stabbing wounds— a fact they did not dispute—so the video would not make any material fact more probable. Overruling Jackson's objection, the court found the video was "material and relevant evidence regarding the crimes."

We see no abuse of discretion in that ruling. The footage added to the likelihood that a jury would find that Austin and Davis were accurate in describing the layout of the house and that Elifritz died from blood loss. The State cleared the "low bar" of relevance. *See id.*

But "[e]ven relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013) (cleaned up). "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403. In deciding if evidence is inadmissible under rule 5.403, we consider its probative value and then weigh that value against the danger of a wrongful effect on the jurors. *Huston*, 825 N.W.2d at 537. A court should exclude evidence if it has an "undue tendency" to encourage a decision based on emotions. *Id.* Jackson has the burden of proving the court abused its discretion in balancing these factors. *See State v. Liggins*, 978 N.W.2d 406, 418 (Iowa 2022).

Jackson asserts: "A video and audio recording of a stabbing victim's last precious moments of life serves no other purpose, when so much other evidence is available in the case, other than to appeal to the jury's sympathies and arouse their sense of horror." *See State v. Plaster*, 424 N.W.2d 226, 231–32 (Iowa 1988). He rebukes the district court's reliance on *State v. Astello*, 602 N.W.2d 190, 197 (Iowa Ct. App. 1999) in weighing the video's probative value against the prejudicial impact. Astello unsuccessfully challenged the admissibility of "gruesome depictions of [the victim's] charred, decomposing, and maggot-infested remains." 602 N.W.2d at 197. On appeal, Jackson distinguishes *Astello* because it involved photographs and videos of the deceased victim, but it "did not deal with a video of a person *actively dying*." Jackson argues that admitting the video of Elifritz was unfairly prejudicial to his case and not harmless.

While we appreciate the sensitive nature of the exhibit, Jackson cites no authority, and we find none, that a different rule applies to the video and audio of a victim in the final moments of life. The district court did not abuse its discretion

in deciding the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice.

At oral argument, Jackson's counsel acknowledged that the State substantially edited the video before trial, alleviating—but not erasing—concerns about its unfairly prejudicial effect. On our review, we find those edits tipped the balance toward the video's probative value. Most of the sixty-five-second clip shown to the jury features Officer Escobar approaching the house. He enters at the forty-first-second mark. Smith leads him to the bedroom where the bed, splashed with bright red blood, is visible for a few seconds. It's true that Elifritz is moaning in pain at the foot of the bed. But most of his body is not visible in the framing of the video. The video shows some blood on the bed and floor around Elifritz, but the camera does not pan to the splatters of blood around the room.

Meanwhile, other evidence—admitted without objection—does detail the gruesome scene. For instance, the jury saw about thirty still photographs, including depictions of the blood-soaked bed, the bloody knife blade and handle, and blood splatters and smears around the house. The photographs are closer than the video and give sharper detail. The jury also received almost thirty pictures of the autopsy cataloguing Elifritz's many wounds and—admitted with Jackson's agreement—the video-recorded testimony of the medical examiner explaining those photographs for nearly an hour.

The jury also heard the entire 911 call on which Elifritz can be heard yelling in agony in the last moments of his life. The audible suffering in that exhibit is greater than what is briefly audible in the body camera video.

In that sea of disturbing images and sounds, the chance that the video clip would influence the jury to decide Jackson's guilt on an improper basis was small. *See Plaster*, 424 N.W.2d at 231–32. And it would not have substantially outweighed the probative value of the on-scene recording. *See Huston*, 825 N.W.2d at 537. On this record, we find no abuse of discretion in the court's ruling.

### 2. Snapchat video with pellet gun

Jackson also objected to showing the jury the Snapchat video he posted of himself brandishing a pellet gun accompanied by a song about revenge. The original video contains written text not visible in the exhibit. The State instead offered—as a separate exhibit—a still photograph of the part of the video that includes the written message:

> Free my bro #donnyjackson
> Fuck 12 and them ****** that gave up his location just know I know where you live and I'm slidin all smoke and I'm not playin yall ****** done fucked with the wrong ******
> All Smoke

(Edited to remove racial slurs.) The court admitted that exhibit without objection from Jackson. On appeal, Jackson focuses on the video showing the pellet gun, not the text, as evidence of a prior bad act.

Generally, evidence of prior bad acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b). Yet such evidence may be offered as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* Admissibility rides on three questions: (1) Was the evidence relevant to a disputed factual issue? (2) Is there

clear proof that Jackson engaged in the act? And (3) does the danger of unfair prejudice substantially outweigh the probative value? *Thoren*, 970 N.W.2d at 626.

Jackson focuses on the first and third questions, contending that the video was not relevant to a disputed fact issue because the murder weapon was a knife, not a pellet gun. He also argues the video confused the jury because Davis claimed to have shot Elifritz with the pellet gun. Jackson further argues that while the text suggested a possible motive for him to enter the home, the video only featured him with a pellet gun.

The State now disputes the applicability of rule 5.404(b)—insisting the video did not show a bad act. But at trial, the State offered the video and text to suggest that Jackson was issuing threats, motivated by revenge, which supported the elements of specific intent and malice aforethought. So, rule 5.404(b) applied.

Still, the district court did not abuse its discretion in admitting the video. It is relevant to show Jackson in a car with Davis and Austin, corroborating their testimony. The Snapchat was posted around 11:00 p.m. on October 27, mere hours before the killing. Granted, the State did not prove the pellet gun Jackson was holding was the same one Davis allegedly fired. Nor were pellets documented at the scene or during the autopsy. But the display of the gun, coupled with Jackson's threat, bolstered the State's proof of his motive.

As for the balancing test, we conclude the danger of unfair prejudice did not overwhelm the video's probative value. The video gives a glimpse into Jackson's conduct before going into the Searle Street house. That glimpse contributes to the State's proof of his specific intent and malice aforethought. And the jury was unlikely to be confused by the pellet gun because Davis testified he was the one

who used it at the home, while the murder weapon was the knife. We see no abuse of discretion in the court admitting the Snapchat video.

Finding substantial evidence of guilt and no evidentiary error, we affirm Jackson's convictions.

**AFFIRMED.**