# IN THE COURT OF APPEALS OF IOWA

No. 23-2073
Filed April 9, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOSEPH DANNIEL HILL,**
        Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Webster County, Adria Kester, Judge.

        The defendant challenges his convictions for two counts of second-degree sexual abuse, four counts of child endangerment resulting in bodily injury, and one count of child endangerment, arguing his motion for mistrial should have been granted and insufficient evidence supports the convictions. **AFFIRMED.**

        Jesse A. Macro Jr. of Macro Law, LLP, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney General, for appellee.

        Considered without oral argument by Greer, P.J., and Langholz and Sandy, JJ.

**GREER, Presiding Judge.**

A jury found Joseph Hill guilty of two counts of second-degree sexual abuse, four counts of child endangerment resulting in bodily injury, and one count of child endangerment—the charges involved five different children to whom Hill was a father figure.[1] Hill challenges his convictions on appeal, arguing (1) his motion for mistrial should have been granted after a witness from the Iowa Department of Health and Human Services (HHS) testified about a "founded" child abuse assessment on the same allegations that were the basis for one of the criminal charges and (2) there is not substantial evidence supporting his convictions.

**I. Background Facts and Proceedings.**

In late April 2022, Annabel (then eight years old) told her school counselor that Hill would have her and her siblings sit on the counter, tell them to close their eyes and open up for a hot dog, and then would put his penis in their mouths. The school counselor reported the allegation to HHS.

Tina Sells, a child protective worker with HHS who performed the investigation into the allegation, was familiar with the family. She and her colleagues had already conducted twenty-six other child-abuse assessments on them. Based on one of those earlier assessments, the children were removed from Hill and their mother for lack of supervision and failure to meet the children's needs. During that removal the children were placed in the home of their

---

[1] To maintain the minor children's privacy and for ease of reading, we used a random-name generator to replace the children's real names. From the oldest child to the youngest, we use the following pseudonyms: Annabel, Brittney, Carl, Darius, and Elisa.

grandparents, where they were happy and well-cared for. That HHS case was eventually closed, and the children were returned to their mother and Hill.

A few days after Annabel's allegation, the children were taken to a child protection center (CPC) for a forensic interview and a medical examination. During the medical examination, Annabel told the nurse practitioner that Hill's "private part" touched her mouth and said it happened more than one time. Brittney (then seven years old) reported that Hill "put[] his no-no square in [her] mouth." When asked what a "no-no square" was, Brittney pointed to her genitals. Brittney said it happened a lot over a long time—"even when [she] was four." She also told the nurse practitioner that Hill "chokes her."[2] When asked for more details, Brittney described Hill putting his arm around her neck and squeezing it; she said she would cry and tell him to stop but he would not listen. During his examination, Carl (then six years old) told the nurse practitioner that he thought he was there because Hill no longer lived in the home with them. When asked what was happening, Carl told her, "He's been hitting us, so maybe that." Carl described being hit "real hard" as punishment and reported it sometimes left bruises; he said he felt safer in the home without Hill there.

---

[2] We recognize the correct terminology for what Brittney and the other children described would be "strangle." *See* Mary Pat Gunderson, *Gender and the Language of Judicial Opinion Writing*, 21 Geo. J. Gender & L. 1, 11 (2019) (discussing how language matters and noting that describing acts of strangulation as "choking" can minimize or mitigate). Because the children consistently used the word "choke," we use that term throughout this ruling.

Hill was charged with crimes in three separate cases, which were later consolidated into one. He maintained his innocence, and the consolidated case with thirteen criminal charges was tried to a jury in October 2023.[3]

At trial, Hill's theory of the case was that Annabel was tired of living in the family's squalid home,[4] where she was often forced to take care of the younger children. Hill suggested that based on her familiarity with HHS, Annabel convinced her siblings to make false allegations against him so the children would be removed and could return to living with their grandparents.

The school counselor testified that Annabel "was very upset, she was scared" as she told her about Hill's actions. Annabel said she was telling because she wanted her brother and sister to be safe; she also told the counselor she did not want to be removed from the family home because she was afraid the siblings would be separated if that happened. During the same discussion, Annabel expressed fear she would be harmed for telling the counselor.

During her testimony, Annabel admitted she did not like living in the family home because "[i]t was not very clean. It was trashy and it had dog poop

---

[3] Hill was charged with three counts of sexual abuse in the second degree, four counts of child endangerment causing bodily injury (class "D" felonies), two counts of child endangerment (aggravated misdemeanors), and four counts of exploitation of a minor.

Before submitting the case to the jury, the district court merged the two counts of child endangerment—leaving the jury twelve counts to decide.

The jury acquitted Hill of one count of sexual abuse in the second degree and all four counts of sexual exploitation of a minor. We do not discuss the allegations that were the basis for these charges.

[4] It was undisputed that the home was dirty and unkempt, with animal feces and bed begs in the home. The children did not have clean or weather-appropriate clothing and were often hungry; teachers at their school laundered their clothes, purchased them necessary clothing items, and set food aside for them to eat.

everywhere—or dog poop and cat poop." She explained that if she did not do as she was told, Hill would either spank or choke her. She described the choking as Hill putting an arm around her neck and said it happened "a lot of times." When Hill choked her, she "wouldn't be able to see anything besides pitch black." When asked how she would "wake up," Annabel said, "It—kind of just, like, the breath came into you." She also saw Hill choke Carl, Brittney, and Darius (who was four years old in April 2022). Annabel also described Hill "put[ting] a blindfold over [her] eyes and tak[ing her] into the bathroom [where] he would—he would take his private and he would put it in [her] mouth." Annabel confirmed that she meant Hill's penis when she said "private."

Annabel was asked if she lied so she would not have to live with Hill anymore. She responded she "did lie but it wasn't huge lies." She denied lying about him choking her, choking her siblings, or putting his penis in her mouth. Annabel also admitted that she came up with a plan with Brittney and Carl so they would not have to live with Hill anymore. She testified, "I told them that where we were living is wrong and that I would like to live with Grandma and Grandpa. So I wanted like—I wanted us to go back to Grandma and Grandpa's so I kind of made kind of a plan . . . ." Annabel's plan was not for the children to lie—the plan was to tell adults what was going on the family home. On direct examination, Annable testified:

> Q. Was your plan to lie?  A. No.
> Q. Was your plan to tell people what was going on at your house?  A. Yes.
> Q. That it was dirty?  A. [The witness nodded her head affirmatively.]  And wasn't a very good environment to live—live in.
> Q. Was part of your plan to tell people about Mr. Hill choking you?  A. Yes, it was to tell them that—how my—like how it—how it

is.  Like what was happening in the house and to, like, answer their questions.

Q. And was any part of that plan to lie to adults about what was going on?  A. No.

Q. Would that be wrong?  A. It would be wrong if I would lie.

Q. So, [Annabel], were you just ready to leave the house and feel safe again?  A. Yes.

Q. You didn't want to leave your mom's house because at [the grandparents' home], you'd get clean clothes?  A. Yes.

Q. Was that the only reason, though?  A. No.  I felt unsafe for him choking me and doing those things with his private to me and I just felt that it was wrong and I didn't want to live there because I knew that my grandma and grandpa would always have their door open for me.

. . . .

Q. . . .[W]e talked about . . . your plan to not live with [Hill] and [the mother] anymore.  When you talked with your siblings, did you tell them to lie?  A. No.

Q. Did you tell them what to say to people?  A. No.

Q. Did you tell them to tell the truth?  A. I didn't tell them, like, exactly to tell the truth.  I just told them, tell them what's happening, what's happening at the house, and what has happened.

Brittney also testified at trial; she described Hill putting his arm around her neck and choking her, which would cause her to "fall asleep."  She saw Hill do the same to the other children—to Annabel and Carl more than one time, while Darius "barely got choked" and Elisa (who was two years old in April 2022) "only got choked, like, once."  Brittney testified that Hill "would show [her] his private and he would put it in [her] mouth."

The State introduced evidence of two videos where Hill hit Elisa in the stomach a total of more than twenty times.  Hill suggested these were play-hits that did not harm Elisa, while the State argued the video showed Elisa unable to catch her breath and—based on the sound from the hits—showed there was force behind them.  The State also introduced a photograph of Darius with a red face and lower ear with text over it that stated, "Yup bc [Darius] threw a hanger at tubbs."

Hill was asked about this while being interviewed by an investigator—the video of the interview was played for the jury. Hill admitted making contact with Darius's face before the photo was taken. He stated he "tried to pop him in the mouth for some discipline" and inadvertently "caught his cheek" when Darius moved his head.

The jury found Hill guilty of seven of the thirteen charges: two counts of second-degree sexual abuse (one involving Annabel and one involving Brittney); four counts of child endangerment resulting in bodily injury (one count each involving Annabel, Brittney, Carl, and Darius); and one count of child endangerment involving Elisa. At sentencing, the district court ordered Hill to serve all seven sentences concurrently, for a total term of incarceration not to exceed twenty-five years with a 70% mandatory minimum.

Hill appeals.

## II. Discussion.

### A. Sufficiency of the Evidence.[5]

Hill challenges the sufficiency of the evidence supporting all seven of his convictions.[6] But we do not consider Hill's arguments. While he recites the scope

---

[5] We take Hill's claims in a different order than he presented them. We address the claim of insufficient evidence first because, if successful, Hill would be entitled to a remand for entry of acquittal, making the question of whether he should receive a new trial moot. *See State v. Trane,* 934 N.W.2d 447, 455 (Iowa 2019) ("If the trial record would not support a conviction on a given count, [the defendant] is entitled to an acquittal on that count, and further proceedings on that count must come to an end.").

[6] Hill moved for a new trial raising weight-of-the-evidence concerns focused on the credibility of the children. Although this challenge involved a different standard, Hill's theme was that judgment should not be entered because the three children made up stories so they could move back with their grandparents. In denying the motion for new trial, the court commented that this theory was not credible; the

and standard of review with cites to authority, the substance of Hill's argument covers more than five pages, which are without any cites to the record or references to authority. Iowa Rule of Appellate Procedure 6.903(2)(a)(8)(3) requires the appellant's brief to include:

> An argument containing the appellant's contentions and the reasons for them with citations to the authorities relied on and references to the pertinent parts of the record in accordance with rule 6.904(4). No authorities or argument may be incorporated into the brief by reference to another document. Failure to cite authority in support of an issue may be deemed waiver of that issue.

Due to Hill's failure to comply with rule 6.903(2)(a)(8)(3), we find his arguments waived and do not consider them.

**B. Motion for Mistrial.**

During her testimony, HHS worker Sells testified about her involvement with the family and explained that in March 2022, HHS received allegations that the condition of the home was unfit and that Hill had physically abused Darius. On direct examination, the following exchange occurred:

> Q. Okay. And let's talk about specifically this assessment that you began in March of 2022. You testified earlier that it was due to possible physical abuse allegations and conditions of the home. Can you tell me what your first step was in your investigation? A. For those allegations?
> Q. Yes. A. So I went out and, you know, met with the mom, met with [Hil], met with the kids, discussed the physical abuse allegation, which I founded.

Hill immediately objected; he argued it was inappropriate for the jury to hear that HHS believed the allegations had merit and asked the court to strike the testimony.

---

case hinged on "whether it is a credible notion that three children—all of whom were eight years old or younger when the offenses occurred—could fabricate and execute a plan to have themselves or their stepfather removed from the home," and the court noted that the jury found the child witnesses credible.

The prosecutor agreed that the statement should be stricken, and the court told the jury, "Ladies and Gentlemen of the Jury, I want you to disregard the last answer by the witness."

The court then took a break so Hill could speak with defense counsel. After the break, Hill moved for a mistrial. The State resisted. It conceded HHS's determination in a particular investigation is not admissible evidence but maintained a mistrial was unnecessary because the prejudice was minimal. The State noted Sell's statement about the "founded" report involved the allegation Hill physically abused Darius. The State argued it had had strong evidence in support of that allegation. After considering the issue, the district court denied the motion to suppress.

On appeal, Hill challenges the district court's ruling. He suggests *State v. Huston*, 825 N.W.2d 531 (Iowa 2013) stands for the proposition that it is always reversible error when a jury hears that HHS issued a "founded" child abuse assessment. We disagree.

In *Huston*, the district court admitted testimony from the HHS worker over the defendant's objection that the worker "founded" two separate child abuse reports, specifically one that pertained to Huston. 825 N.W.2d at 535. In other words, the jury was allowed to use evidence of the founded report in making its determination whether the defendant was guilty of child endangerment causing serious injury. *Id.* On appeal, the defendant argued the jury should not have been allowed to consider the evidence, and our supreme court agreed. *Id.* at 537. It concluded there was "no probative value to the [HHS] determination the abuse report against [the defendant] was founded" because it was "irrelevant to any issue

for the jury to decide." *Id.* at 537. It also cautioned there was "a real danger the jury will be unfairly influenced by that agency finding, which gives the 'imprimatur' of a purportedly unbiased state agency on a conclusion that [the defendant] was guilty of child abuse." *Id.* at 537–38. Because the evidence was unfairly prejudicial to the defendant, it was an abuse of discretion for the district court to admit it. *See id.* at 539. And with the admission of improper evidence, prejudice to the defendant was presumed. *Id.* Because the State could not overcome that presumption on appeal to show it was harmless error for the jury to hear there was a founded report, the defendant in *Huston* was entitled to a new trial. *Id.* Although it was not requested, the *Huston* court noted, "We do not believe it would have been proper in this case to allow testimony that the child abuse report was determined to be founded even with a limiting instruction" that might explain the different standards and burdens of proof related to an administrative action. *Id.* Likewise, because the risk of unfair prejudice was "exacerbated" by further testimony over the defendant's ability to appeal the HHS ruling to overturn the founded report, "prejudice [was] presumed, and the State [bore] the burden of showing lack of prejudice." *Id.* (citation omitted).

In contrast, at Hill's trial, the district court (and the State) recognized Sells's statement about the founded report was inadmissible. The court immediately struck the statement by telling the jury to disregard Sells's last answer, thus not drawing undue attention to it—the jury was not allowed to consider evidence of the "founded" report when deciding Hill's guilt. And after speaking with the parties, the court also gave a curative instruction as part of the jury instructions, which stated:

> Witnesses may have made certain evaluations and reached certain conclusions in performing their jobs separate and apart from the jury's function. As the sole factfinder of the court, you may not accept any lower standard of proof adopted by [HHS] or adopted by law enforcement in the course of investigating allegations against [Hill].

The question before us is different than the question in *Huston*—was Hill denied a fair trial because the jury heard Sells mention a "founded" report even though it was told not to consider that evidence when deciding whether Hill was guilty? *See State v. Brown*, 996 N.W.2d 691, 696 (Iowa 2023) ("The defendant is only entitled to a new trial if the prejudice resulting from the denial [of a motion for mistrial] prevented the defendant from having a fair trial."). Here, Hill must "show sufficient prejudice to constitute denial of a fair trial." *State v. Belieu,* 288 N.W.2d 895, 900 (Iowa 1980).

In deciding the answer to that question, we note our review of the district court's denial of a motion for mistrial is for an abuse of discretion. *See Brown*, 996 N.W.2d at 696. And "a district court's decision not to grant a mistrial but to offer a cautionary instruction instead is entitled to broad deference." *State v. Plain*, 898 N.W.2d 801, 815 (Iowa 2017). "Cautionary instructions are sufficient to mitigate prejudicial impact of inadmissible evidence 'in all but the most extreme cases.'" *Id.* (citation omitted). And this is not one of those extreme cases. As already stated, the jury was told to disregard the statement when it was made and was also later instructed against relying on any HHS assessment. *See State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010) (recognizing the supreme court has "found harmless error when the trial court struck erroneously admitted evidence from the record and immediately admonished the jury to disregard the evidence"); *State v. Becker*, 818

N.W.2d 135, 162 (Iowa 2012) ("[J]uries are presumed to follow the court's instructions."). And here, the statement regarding the founded report involved only one of the thirteen charges against Hill—the allegation he committed child endangerment resulting bodily injury against Darius. Even more, the State's evidence for that charge was strong; it included video where Hill admitted to an investigator that he hit Darius in the face when he was intended to "pop him" in the mouth and a picture showing injury to Darius's face after the hit.

The inadvertent statement about a "founded" child abuse report, which was quickly struck from the record and which the jury was told not to consider, did not prejudice Hill. And the evidence in support of the related criminal charge was strong. Therefore, the district court did not abuse its discretion in denying Hill's motion for mistrial.

**III. Conclusion.**

We do not consider Hill's claims challenging the sufficiency of the evidence, and the district court did not abuse its discretion in denying Hill's motion for mistrial. We affirm his convictions.

**AFFIRMED.**